**BALTIMORE SCRAP CORPORATION**

v.

**THE DAVID J. JOSEPH CO., et al.**

**No. CIV. L–96–827.**

United States District Court,
D. Maryland.

Jan. 6, 2000.

Charles S. Hirsch (Ballard, Spahr, Andrews & Ingersoll, LLP), Baltimore, MD, and Carl W. Hittinger (Stevens & Lee), Philadelphia, PA, for plaintiff.

Robert J. Carson and Gary Ralph Jones (Baker & Baker), Baltimore, MD, and G. Jack Donson (Taft, Stettinius & Hollister), Cincinnati, OH, for defendant The David J. Joseph Co., t/a United Iron & Metal Co.

Thomas M. Wood, IV. and John J. Kuchno (Neuberger, Quinn, Gielen, Rubin & Gibber, PA), Baltimore, MD, for movant United States Holdings Co., Inc.

## MEMORANDUM

LEGG, District Judge.

This is an antitrust suit. Before this Court are the defendants' motions for summary judgment. Because the parties have extensively briefed the issues, the Court will dispense with a hearing. *See* Local Rule 105.6 (D.Md.1999). For the reasons stated herein, the Court will, by separate Order, grant the defendants' motions and close the case.

## I. Introduction

Because of the complexity of the facts, a brief introduction may be useful. In 1991, the plaintiff, the Baltimore Scrap Company, ("Baltimore Scrap" or "BSC"),[1] proposed installing a new scrap metal shredder in the Fairfield section of Baltimore City. The proposal required zoning approval from the City. A coalition of citizens groups openly opposed the shredder on environmental grounds. The defendants,[2] who owned an existing shredder and did not welcome the competition, secretly set about to thwart BSC's zoning application.

After initially rejecting it, the Board of Municipal Zoning Appeals (BMZA) approved Baltimore Scrap's application on August 6, 1992. The defendants had standing to appeal the BMZA's decision to the Circuit Court for Baltimore City. The defendants were concerned, however, that an appeal in their name, a competitor with a spotty environmental track record, would lack credibility.[3] The defendants decided that bankrolling an appeal by a citizens group, while masking their own involvement, presented a better strategy.

To carry out their plans, the defendants contacted an attorney and offered to pay him if he were, in turn, approached by the citizens groups. An employee of one of the defendants' subsidiaries (Marlen Trading Company), posing as a "concerned local business," approached the citizens groups, offering that if the citizens wished to pursue an appeal of the BMZA decision, Marlen would pay their legal costs, including attorneys' fees. The employee also steered the citizens to the attorney whom the defendants had already contacted. The citizens groups accepted the offer. Neither Marlen nor the attorney told the citizens that the defendants, rather than an environmentally concerned local business, were behind the appeal.

Over the next seven months, the defendants were actively, albeit clandestinely, involved in the citizens' appeal. The defendants paid the bills, reviewed the pleadings, and suggested strategies. Eventually, however, the defendants' involvement in the zoning litigation came to light through what the parties refer to as the "errant fax."

Ultimately, Baltimore Scrap's application was successful and its shredder was built. BSC argues, however, that the appeal delayed the installation of the shredder by approximately eighteen months. Claiming fraud and violation of the antitrust laws, the plaintiff filed the instant suit.

The Court finds the defendants' actions deceitful and underhanded. This is a conclusion reached not only by this Court, but also by the defendants' own antitrust attorney. Concerned that their secret role in the zoning appeal might expose them to antitrust liability, the defendants consulted Richard Wertheimer, a partner at the Washington, DC law firm of Arnold & Porter. Wertheimer advised the defendants that their actions, while probably not illegal, were unworthy of a respectable business.

Although morally wrong, the defendants' disguised role in the zoning appeal was not illegal. Under the *Noerr–Pennington* doctrine, a company may, even secretly and for anticompetitive purposes, sponsor a lawsuit against a competitor, so long as the lawsuit is neither a sham, meaning that it is not objectively baseless, nor fraudulent.

---

**1.** During the events giving rise to this lawsuit BSC was known as Brooklyn Salvage Corporation. For the sake of clarity, the parties have used "Baltimore Scrap" to refer to both the present corporation and its predecessor, a practice the Court will adopt.

**2.** There are two sets of defendants in this case, all of whom are past or present owners of the existing shredder. The relationship among the various defendants and their involvement with this case are explained later in this Memorandum.

**3.** The defendants anticipated that part of the appeal would raise environmental issues.

The appeal was not sham litigation. Although ultimately unsuccessful, the citizens' appeal raised bona fide legal issues, including (i) whether the citizens had standing to appeal, and (ii) whether the BMZA had used the appropriate legal standard in authorizing a zoning permit for the new shredder.

Nor do the defendants' actions add up to fraud. The errant fax unmasked the defendants' involvement in the litigation before the Circuit Court for Baltimore City had issued its final decision. Baltimore Scrap has not shown that the litigation would have been shorter had the courts known from the outset that the defendants were clandestinely financing and advising the appeal. Nor is there evidence that any judicial rulings were predicated upon the misassumption that the citizens, and the citizens alone, were pressing the appeal.

This Opinion is not meant to condone the defendants' tactics. The Court agrees with Attorney Wertheimer that the defendants' actions were unworthy of a legitimate business. At the same time, however, the Court finds that the defendants' actions fell short of violating the antitrust laws.

## II. Factual Background

### A. *Litigation Timeline*

The following summarizes the major events in the history of the zoning litigation:

| | |
|---|---|
| July 1991: | Baltimore Scrap Company leased Carbon Avenue junk yard site. |
| November 25, 1991: | BMZA rejected BSC's application for a construction permit. Vote was 3–1 in favor of issuing the permit, but four votes were required for approval. |
| August 6, 1992: | BMZA approved BSC's second application for a construction permit. The Board found the second application substantially different from the first. The language of the Board's decision appeared to classify the proposed shredder as a material recovery facility (MIRF). Such a classification would be incorrect, because a MIRF: (i) is not authorized to accept certain types of metal which the shredder was to process, and (ii) must be contained in an enclosed facility. |
| August 27, 1992: | Citizens groups, represented by David Irwin, filed an appeal of the BMZA's decision in the Circuit Court for Baltimore City. |
| October 13, 1992: | Gloria Sipes moved to intervene as a plaintiff in the zoning appeal. Shortly thereafter, BSC moved to dismiss the zoning appeal, arguing the citizens groups lacked standing and Sipes's Motion to Intervene was time-barred. |
| December 7, 1992: | Hearing on procedural motions held before Judge Thomas Ward. Judge Ward granted Ms. Sipes's Motion to Intervene and denied BSC's Motion to Dismiss. |
| January 7, 1993: | Hearing on the merits of the zoning appeal held before Chief Judge Robert I.H. Hammerman. Chief Judge Hammerman approved of Judge Ward's procedural rulings. He further ruled that substantial evidence supported the Board's conclusion that the 1992 application was substantially different from the first. He remanded the case to the BMZA, however, so that the Board could explain why it had classified the shredder as a MIRF. |
| February 25, 1993: | Hearing before Chief Judge Hammerman on Baltimore Scrap's motion to alter or amend judgment. BSC produced the Gadhia affidavit. The affidavit stated that: (i) the Board's reference to the MIRF provisions was unintentional; and (ii) the BMZA made a clerical error in classifying the proposed shredder as a MIRF. According to Gadhia, the shredder should have been considered a structural alteration to a junk yard conditional use. With this correction, the BMZA's decision was now internally consistent and correct, Gadhia explained. |
| March 1, 1993: | Chief Judge Hammerman accepted the Gadhia affidavit even though it was not part of the administrative record, and was written after the record had been transmitted to the Circuit Court for Baltimore City. Chief Judge Hammerman decided that the Gadhia affidavit cured the inconsistencies in the BMZA decision. Accordingly, he granted BSC's motion to alter or amend judgment by (i) not remanding the case to the BMZA, and (ii) affirming the BMZA's decision. |
| March 24, 1993: | The involvement of the defendants was first exposed with the transmission of the errant fax. |
| March 25, 1993: | The citizens groups moved to stay enforcement of Chief Judge Hammerman's ruling pending appeal to Court of Special Appeals. |
| April 3, 1993: | Irwin met with leaders of the citizens groups and revealed the identity of their benefactors. After discussion, the citizens groups decided to continue with the appeal. |
| April 23, 1993: | Chief Judge Hammerman denied the citizens groups' Motion to Stay Enforcement, and stated he perceived the hand of United Holdings in the appeal. |
| January 7, 1994: | Court of Special Appeals remanded the case with instructions to dismiss the appeal, holding the citizens groups lacked standing and Sipes's intervention was time-barred. |

### B. *The Metal Shredding Industry*

Shredding companies buy scrap metal, shred the metal, and sell the processed scrap to steel mills, foundries, and scrap metal brokers. Eventually, the shredded scrap is melted down and reprocessed. Shredders operate on a narrow profit margin, representing the difference between the price they must pay for scrap (e.g. junked cars and dishwashers) and the price they receive from mills and brokers. Competition from another shredder squeezes the profit margin by driving up the scrap metal price and driving down the price of processed scrap.

Prior to the events giving rise to this lawsuit, the United Iron & Metal Company operated at 2545 Wilkens Avenue in southwest Baltimore the only shredder in the metropolitan area. Before 1990, the United shredder was owned by the defendants referred to during this litigation as the "Shapiro defendants."[4]

In September, 1990, the David J. Joseph Company ("DJJ") bought the United Iron & Metal shredder from the Shapiro defendants. DJJ, which is based in Cincinnati, Ohio, is the largest metal recycler in the United States.[5] The deal was structured so that the Shapiro defendants retained a financial interest in the Wilkens Avenue operation.

Metal recycling and shredding can create significant environmental problems. Cars and refrigerators contain many other materials besides valuable steel scrap. Freon, upholstery, plastics, and a host of other "contaminants" must be removed either before or during shredding. In such a low margin business, shredders have an economic disincentive to spend money controlling and containing the non-salable by-products. Over the years, community and environmental groups lodged repeated complaints about excessive noise and pollution coming from the United Iron & Steel's Wilkens Avenue plant. *See, e.g.,* Plaintiff's Exh. 26.

David Simon, the president of Baltimore Scrap, operated a recycling business in Pennsylvania. Seeking to expand, Simon sought to open a shredder in New York State. In the face of community opposition, however, his permit was denied. Having already purchased the shredding machine intended for installation in New York, Baltimore Scrap looked for an alternative location.

In July 1991, Baltimore Scrap leased a junk yard located at 1600 Carbon Avenue in Baltimore. The owner, Mr. Frank Gambel, had installed and operated two shearers, which were a more primitive type of metal recycling machinery. After leasing 1600 Carbon Avenue, Baltimore Scrap closed down the shearers and began cleaning the lot in preparation for the new shredder.

Prior to Baltimore Scrap's public announcement, DJJ received word of the new potential competitor. On July 18, 1991, DJJ's Baltimore manager, David Workum, sent a memo to DJJ executive James Breth. *See* Plaintiff's Exh. 12. Workum wrote that he had heard "in the past three to six months" that BSC was planning to install a shredder. DJJ began working behind the scenes to block BSC:

> Through connections of I.D. Shapiro and Warren Rich, we are trying to block Brooklyn's move to install a shredder. . . . Warren Rich is attempting to find any EPA problems Simon may have had [elsewhere], again to discredit his permitting attempt. Warren is handling all this so as to keep DJJ and United's name out of the picture.[6]

*Id.*

Prior to any zoning application being filed, DJJ (i) knew Baltimore Scrap intended to become a competitor in the Baltimore scrap market, (ii) was seeking ways to prevent that from happening, and (iii) real-

---

**4.** The Shapiro defendants are: I.D. Shapiro; James Shapiro; Charles Baum; United Holdings Co., Inc. (a successor to United Iron & Metal); United Operating Co., Inc.; and United Investment Enterprises Partnership. The plaintiff's complaint focuses on the actions on I.D. Shapiro. Based upon papers presented to the Court, James Shapiro and Charles Baum played minor roles in the events giving rise to this lawsuit. Because judgment is being entered in favor of all the Shapiro defendants, the Court has not been called upon to determine whether James Shapiro and Charles Baum are more than nominal defendants.

**5.** The amended complaint named as additional defendants the David J. Joseph Co. ("DJJ") and the manager of its Baltimore facility, David J. Workum, III.

**6.** Warren Rich was an attorney representing DJJ. At the time he was affiliated with the firm of Graham and James.

ized that it would be unwise for a shredder company with its own environmental problems publicly to oppose Baltimore Scrap's application.

### C. The 1991 Zoning Hearing

In September 1991, Baltimore Scrap filed an application with the Baltimore zoning administrator for a permit to install the new shredder at the Carbon Avenue site. *See* DJJ Defendants' [hereinafter "DJJ"] Exh. A1. Because BSC's application called for structural alterations to a conditional use, the application, under Baltimore zoning regulations, was automatically appealed to the Baltimore Board of Municipal and Zoning Appeals ("BMZA"). The appeal was apparently *de novo,* meaning that the BMZA could consider testimony and decide issues of fact.

DJJ continued to investigate ways to prevent Baltimore Scrap's entry into the scrap metal market. Two attorneys working for DJJ, Warren Rich and Timothy Henderson, contacted the Maryland Department of the Environment to determine if BSC had ever been the subject of any environmental investigations. *See* Plaintiff's Exh. 24. As early as July 1991, I.D. Shapiro and his attorney, Isaac Neuberger,[7] contacted several city officials and political figures to voice their objections to Baltimore Scrap's application. *See* Plaintiff's Exh. 1 at 38–41; Second Dep. of I.D. Shapiro at 570–72, 580–82.[8]

7. Neuberger's law firm, Neuberger, Quinn, Gielen, Rubin & Gibber, P.A., is called "The Neuberger Firm" by parties, and will be so called by the Court.

8. DJJ officials were aware of Shapiro's efforts. *See* Plaintiff's Exh. 21.

9. BSC contends the conclusions reached in the Henderson report are false. BSC claims the defendants underestimated the amount of scrap available in the Baltimore area by assuming that No. 2 steel, including white goods, automobile bumpers, and portions of automobile fenders, cannot be shredded. *See* Aff. of David M. Simon, Plaintiff's Exh. 3. The

Concerned about the antitrust implications of these activities, DJJ, on November 6, 1991, consulted Richard J. Wertheimer of Arnold & Porter. Wertheimer advised DJJ Vice President Stephen Wulff that legitimate petitioning of the government was protected by the *Noerr–Pennington* doctrine, but lying or deceit was not. Dep. of Stephen Wulff at 90–94.

Through Attorney Timothy Henderson, DJJ, on November 19, 1991, submitted to the Baltimore Department of Planning and Zoning a study of the Baltimore scrap market. The report, prepared by DJJ, inferred that the new shredder was not needed because the shredding capacity of the Baltimore market exceeded the demand.[9] *See* DJJ's Exh. D12.

On the same day, the BMZA held its hearing on Baltimore Scrap's application. A number of individual citizens and citizens groups appeared to testify against the application. Many of the witnesses cited environmental objections. *See* Plaintiff's Exh. 4. On November 25, 1991, the BMZA voted 3–1 in favor of the zoning variance. Because four votes were required for approval, the application was denied.[10] The member casting the opposing vote cited environmental reservations. *See* BMZA Resolution, DJJ Exh. A5.

### D. The 1992 Zoning Hearing and Initial Appeal

In the summer of 1992, Baltimore Scrap again sought approval from the zoning board for a construction permit.[11] Under

defendants, on the other hand, assert they used standard industry assumptions in making their estimates. This dispute is not material, because there is no evidence that the zoning authorities gave any consideration to the Henderson report. *See* Part III.B.3.c, *infra.*

10. One of the five BMZA members was absent, meaning that a unanimous vote in favor of Baltimore Scrap would have been required.

11. As in 1991, the decision of the zoning administrator was automatically transmitted to the BMZA for review.

Baltimore City zoning law, a zoning application disapproved by the BMZA cannot be considered again by the Board for one year. The one-year waiting period does not apply if the application is "substantially" different from the one previously rejected. In this case, BSC argued that the 1992 application was substantially different because it proposed to protect groundwater by paving the site with concrete and installing an oil/water separator. The BMZA accepted BSC's argument and considered the second application before the one-year waiting period had expired. *See* DJJ Exh. B6.

Many of the same citizens groups that had opposed the 1991 application again appeared before the Board. This time, however, the BMZA was apparently convinced that the proposal had sufficient environmental safeguards. On August 6, 1992, Baltimore Scrap prevailed: the BMZA issued a written decision granting the construction permit. *See* DJJ Exh. B8. In the text of its decision, however, the BMZA erroneously referred to the shredder as a material recovery facility ("MIRF"). As will be seen, this clerical error was to cause problems for the BMZA and Baltimore Scrap, because a MIRF is not authorized to accept certain varieties of ferrous metals which the shredder was intended to process. In addition, a MIRF must be contained in an enclosed facility, which the proposed shredder was not.[12]

I.D. Shapiro discussed with his Attorneys, Rich and Neuberger, the option of filing an appeal in United Holdings's name. *See* Plaintiff's Exh. 1 at 16. As a taxpayer, United Holdings would have enjoyed standing to appeal the BMZA's decision to the Circuit Court for Baltimore City. The group was concerned, however, that an appeal by a competitor, especially one with

a spotty environmental track record, would lack credibility.

Instead, the group struck upon the idea of funding an appeal by the citizens. At the defendants' behest, an official of the Marlen Trading Company[13] approached Gloria Sipes, the president of the Community of Curtis Bay Association ("CCBA"). The defendants chose Ms. Sipes because she had spoken in opposition to Baltimore Scrap's application. The Marlen official told Sipes that "local businesses" wanted to fund an appeal, and that if interested she should contact attorney David Irwin. On August 24, 1992, Ms. Sipes called Irwin. *See* Dep. of David Irwin at 25. Isaac Neuberger had already spoken with Irwin, promising that he would be compensated if he represented the citizens groups. *See id.* at 27–28.

The defendants devised a roundabout scheme to handle payments to Irwin. Irwin submitted bills to CCBA. *See, e.g.,* Plaintiff's Exh. 14. Sipes transmitted the bills to Marlen Trading, which wrote checks to CCBA. Sipes, in turn, endorsed the checks to Irwin's firm. DJJ later reimbursed Marlen Trading for its outlays. *See* Plaintiff's Exhs. 15 & 16.

On August 27, 1992, Irwin filed an appeal on behalf of the citizens groups in the Circuit Court for Baltimore City. The named appellants were three citizens groups: Community of Curtis Bay Association Inc., Concerned Citizens for a Better Brooklyn, Inc., and Maryland Waste Coalition. The names of Shapiro, DJJ, and United Iron & Metal did not appear on the court papers. *See* DJJ Exh. C1.

The appeal asserted three grounds for reconsideration of the zoning board's decision: (i) that Baltimore Scrap's second application was not substantially different from its first application; (ii) that the zoning board had improperly classified Balti-

---

12. As stated in Part II.E *infra,* the Board did not intend to classify the shredder as a MIRF. As explained in the Gadhia affidavit, the Board's decision mistakenly quoted provisions of the zoning code relating to a MIRF.

13. I.D. Shapiro owned a "substantial interest" in Marlen Trading. *See* DJJ Mem. Supp. Summ. J. at 18.

more Scrap's facility as a "MIRF" (material recovery facility), whereas in fact a MIRF is not authorized to accept certain ferrous metals the shredder would be processing; and (iii) if the facility were properly classified as a MIRF, then the Board's decision was also erroneous because it misquoted and misconstrued provisions of the zoning code pertaining to enclosure requirements of a MIRF. On October 13, 1992, Irwin moved to add Gloria Sipes as a plaintiff.

Baltimore Scrap filed two procedural objections to the appeal. It opposed Ms. Sipes's Motion to Intervene as time-barred, and it moved to dismiss the appeal on the grounds that the citizens groups lacked standing because they were neither taxpayers nor "aggrieved persons". *See* BSC Motion to Dismiss or In the Alternative, for Summary Judgment, DJJ Exh. C10. The procedural motions were assigned to Judge Thomas Ward, an Associate Judge of the Circuit Court for Baltimore City, who held a hearing on December 7, 1992.[14] Judge Ward granted the Motion to Intervene (adding Gloria Sipes as a plaintiff), and denied Baltimore Scrap's Motion to Dismiss. *See* DJJ Exh. C16.

The zoning case on its merits was assigned to Chief Judge Robert I.H. Hammerman of the Circuit Court for Baltimore City. During a hearing on January 7, 1993, Chief Judge Hammerman commented upon and approved Judge Ward's earlier procedural ruling. He stated: "[W]ithout having heard oral argument, if I were to have made the decision last night after all my research on this and reading the authorities, I would have decided the same way." Transcript of Hearing, DJJ Exh. C19 at 5.

During the hearing, Chief Judge Hammerman also ruled that substantial

evidence supported the BMZA's determination that the second application was substantially different from the first. At the same time, however, he observed that he might have ruled differently had the standard of review offered him more latitude: "I'm not saying that if I were to decide it totally unencumbered, so to speak, that I would find the same way as the Board." [15] *Id.* at 27.

Chief Judge Hammerman nevertheless remanded the case to the BMZA for reconsideration of the plaintiffs' second and third arguments: to wit, that the Board had misclassified the application as a MIRF, and that the proposed facility would not meet the requirements of a MIRF. Addressing Baltimore Scrap's arguments that the classification was simply a clerical error, Chief Judge Hammerman stated:

> I am not prepared to say this was a slip of the pen, a slip of the tongue.... There are several places on page two, and even on page three, which would clearly indicate that the Board is looking upon this as a materials recovery facility.... So I just cannot share the argument or the characterization by the Appellees that this means nothing, this language, [is] simply to be totally ignored.

*Id.* at 28.

Both the DJJ and Shapiro defendants were closely involved with the citizens' appeal. I.D. Shapiro paid Irwin's legal fees via Marlen Trading Company. Isaac Neuberger and I.D. Shapiro communicated with Irwin concerning strategies for the case. *See* Plaintiff's Exhs. 13 & 47. Thomas "Sam" Wood, a member of the Neuberger firm, forwarded copies of the pleadings to I.D. Shapiro, noting that Irwin "is representing our interest." Plaintiff's Exh. 30. Irwin admits he sent "most,

---

**14.** Unfortunately, there is no transcript of the December 7 hearing because of a mechanical problem with the court reporter's recorder.

**15.** On appeal to the Circuit Court, a zoning board's decision must be upheld if supported by substantial evidence. *See, e.g., Aaron v. City of Baltimore*, 207 Md. 401, 406, 114 A.2d 639 (1955).

if not all" of his pleading drafts to Wood, and that the Neuberger firm was a "resource in this case." Dep. of David Irwin at 35. In contrast, Mr. Irwin did not submit these drafts to Ms. Sipes or the citizens groups for prior approval. *See id.*

At the same time, both the DJJ and Shapiro defendants continued to mask their involvement.[16] Their names never appeared on the papers. The citizens groups were not told who (beyond Marlen Trading Company) was funding their appeal.[17] *See, e.g.,* Deps. of Gloria Sipes at 213, Doris McGuigan at 25, Delores Barnes at 43. Neither Gloria Sipes nor the citizens groups were told that I.D. Shapiro and his personal attorneys were vetting the pleadings and suggesting strategies.

The plaintiffs did, however, have hints that the defendants were involved in the zoning appeal. On August 25, 1992, Colleen Darden, a BSC employee, received a call from a person identifying himself as William Thomas.[18] Thomas said that "United Iron & Metal gave the people who were fighting us a very large sum of money . . . ." DJJ Exh. D37. Darden forwarded the message to David Simon. *See* February 18, 1998 Dep. of David Simon at 426.

### E. Reconsideration of Chief Judge Hammerman's Ruling and Court of Special Appeals Decision

Baltimore Scrap requested Chief Judge Hammerman to reconsider his decision to remand the case to the BMZA.[19] In support of its motions, BSC submitted an affidavit it had obtained from BMZA chairman Lalit Gadhia ("the Gadhia affidavit"). DJJ Exh. C26. Gadhia stated that the Board's August 6, 1992 decision had mistakenly cited provisions of the zoning code relating to a material recovery facility (MIRF). The decision should have instead referred to a structural alteration to a junk yard conditional use.[20]

On February 25, 1993, Chief Judge Hammerman held a hearing on Baltimore Scrap's motions. Benjamin Rosenberg, counsel for Baltimore Scrap, conceded that the BMZA's decision was confusing, but stated that the confusion was cleared up by the Gadhia affidavit. Rosenberg argued: "The Court's confusion and our confusion was perfectly understandable in light of the way this decision was written. We now know unmistakably and indisputably that that was a mistake." Transcript of hearing, DJJ Exh. C27 at 23.

**16.** The plaintiff argues that the defendants concealed their identity, in part, because had the citizens groups known a competing shredder company, with environmental problems of its own, was funding the appeal they would not have accepted the assistance. *See, e.g.,* Dep. of. Gloria Sipes at 142, 213. During discovery in the instant case, Ms. Sipes and others were questioned as to what their reaction would have been had they known of the Shapiro defendants' role. The citizens' reactions were mixed. All said they would have been upset. Some testified that they would probably have accepted the money. Others testified that in retrospect they would have rejected the funding, even though without Marlen's financial support, the appeal would not have been possible. *See infra* Part III. B.3.a.

**17.** Defendants point out that I.D. Shapiro's interest in Marlen Trading is on file with the Maryland Department of Assessments and

Taxation and is therefore a matter of public record. While Defendants are correct, a technical corporate filing hardly amounts to disclosure to a citizen group.

**18.** The true identity or affiliation of "William Thomas" remains unknown.

**19.** On or about January 18, 1993, Baltimore Scrap filed Motions for a New Trial, to Alter or Amend Judgment, and to Revise Judgment. *See* DJJ Exh. C20.

**20.** A material recovery facility (MIRF) is not authorized to accept certain varieties of ferrous metals which BSC was to process. It must also be completely enclosed. The citizens groups argued that by approving the BSC shredder as a MIRF, the Board had applied an incorrect statutory standard. By explaining the references to a MIRF as a mistake, the Gadhia affidavit made the Board's decision internally consistent.

Over Irwin's objections, Chief Judge Hammerman accepted Gadhia's affidavit and found it persuasive proof that the Board did not intend to classify BSC's shredder as a MIRF. Rather, the MIRF classification was a clerical error. The BMZA intended instead to approve the application as a structural alteration to a junk yard conditional use, which was authorized under Baltimore zoning code to accept a full range of ferrous metals.[21] Chief Judge Hammerman granted BSC's Motion and affirmed the BMZA decision of August 6, 1992. This meant BSC's permit would issue.

The defendants' covert involvement during the appeal continued. I.D. Shapiro met with DJJ President Louis Terhar on February 23, 1993 and asked Terhar to reimburse him for the legal expenses he had incurred in fighting BSC's zoning application. Shapiro boasted he had "saved him [Terhar] so far by full-time maneuvering two years." Dep. of I.D. Shapiro at 515–16. On March 1, Terhar agreed to fund further appeals. Dep. of Louis Terhar at 6–11.

The defendants' cloak of secrecy began to unravel on March 24, 1993. David Workum intended to fax to Attorney Warren Rich a copy of a draft motion to stay Chief Judge Hammerman's ruling. Instead, the fax was mistakenly sent to a third party, Harry Lenick, a Pittsburgh scrap dealer.[22] Workum had obtained the draft from the Neuberger Firm, which had in turn received it from Irwin. Upon receiving the "errant fax," Lenick forwarded it to Baltimore Scrap's President David Simon.

The following day, March 25, Irwin, on behalf of the citizens groups, moved to stay enforcement of Chief Judge Hammerman's judgment pending appeal to the Maryland Court of Special Appeals. *See* DJJ

Exh. 29. In its opposition memorandum, Baltimore Scrap drew the Court's attention to the errant fax, arguing that the citizens groups were only acting as "surrogates" for the real parties in interest, United Holdings and persons associated with United. Baltimore Scrap also demanded the citizens groups post a supersedeas bond pending the appeal.

In a reply brief filed April 16, 1993, Irwin, arguing for the citizens groups, stated, "United is not, openly or 'under the table,' the real party in interest in this case, and has in no way 'enlisted Appellants to serve as United's stalking horse to prosecute the appeal' of the Board's decision." DJJ Exh. C37 (quoting BSC opp. mem.). Irwin further argued that a bond was inappropriate, in part because the citizens groups and Ms. Sipes lacked sufficient funds to obtain one. *Id.*

Around the same time, in late March, Wulff again consulted with attorney Richard Wertheimer of Arnold & Porter. After discussions with both Wulff and Wood, Wertheimer advised Wood that Irwin had an ethical obligation to disclose to Ms. Sipes and the citizens groups the source of the financial support for their appeal.

On April 3, Irwin met with leaders of the citizens groups and revealed the involvement of United Holdings, I.D. Shapiro, and Marlen Trading in funding the appeal. At least some of the groups' leaders were "upset" and "disappointed" about the identity of their benefactor, but, after a lengthy discussion, they decided to press on with their appeal. *See* Deps. of David Irwin at 411–27, Gloria Sipes at 120–21, 248, Mary Rosso at 60.

On April 23, 1993, Chief Judge Hammerman held a hearing on the citizens groups' motion to stay enforcement. Chief Judge

---

**21.** Although the parties disagreed over the meaning of the term "structural alteration to a junk yard conditional use," Chief Judge Hammerman stated that the affidavit proved the "Board was approving the application for the uses requested." DJJ Exh. C27 at 27.

**22.** This transaction has come to be known in the litigation as the "errant fax."

Hammerman questioned Irwin concerning the involvement of the defendants:

| | |
|---|---|
| CHIEF JUDGE HAMMERMAN: | Mr. Irwin— |
| MR. IRWIN: | Yes, sir. |
| CHIEF JUDGE HAMMERMAN: | You state, with respect to the [s]talking horse matter, that the only people you represent are the good people sitting here who are neighbors and residents. |
| MR. IRWIN: | That is absolutely correct. |
| CHIEF JUDGE HAMMERMAN: | How do you explain the affidavit [of Mr. Lenick] and how do you explain that Exhibit A [the errant fax]? |
| MR. IRWIN: | I don't believe I have to explain it, Your Honor, in the sense that my law firm hasn't been sending anything—I mean, there is nothing in this affidavit that says my law firm is involved with United in any— |

DJJ Exh. 38 at 28–29.

Chief Judge Hammerman denied the motion to stay, stating that there was no likelihood the citizens would succeed on appeal. Chief Judge Hammerman also noted that, despite Irwin's disclaimers, he perceived the "hand of United Holding Company" in the appeal:

> I am suggesting ... that it is clear to me that United has an interest in the outcome of this case and has carried that interest beyond simply standing on the sidelines as an interested observer but has participated in the legal effort to prevent Brooklyn Salvage from achieving their goal. I think they have gone from the role of an interested observer to the role of an active participant.

DJJ Exh. C38 at 34.

Although their motion to stay had been denied, the citizens groups pressed on with their appeal to the Court of Special Appeals.[23] The citizens groups urged the Court of Special Appeals to reverse because the Circuit Court had committed the following errors: (i) considering Gadhia's affidavit, which was not part of the agency record; (ii) giving weight to Gadhia's affidavit even though the affidavit contradicted a unanimous resolution of the BMZA; (iii) affirming the BMZA's decision even though the resolution cited inapplicable

provisions of law; and (iv) determining that the BMZA's revised decision was supported by substantial evidence. *See Sipes v. Board of Municipal and Zoning Appeals,* 99 Md.App. 78, 81, 635 A.2d 86 (1994).

On January 7, 1994, the Court of Special Appeals issued an opinion and order which remanded the case with instructions to dismiss the appeal. The Court held that the citizens groups lacked standing because they were neither taxpayers nor "aggrieved" parties. Gloria Sipes as an individual and a taxpayer did have standing, but her motion to intervene was time-barred. The Court of Special Appeals stated the case was thus, "dead on arrival in circuit court." *Sipes,* 99 Md.App. at 99, 635 A.2d 86. The citizens groups did not petition for certiorari to the Maryland Court of Appeals. Zoning in hand, Baltimore Scrap built the new shredder.

### F. Filing of the Lawsuit

Baltimore Scrap filed the instant suit on March 19, 1996. Discovery was complicated because so many lawyers and law firms were witnesses. With the approval of both sides, the Court appointed a special discovery master, Rignal W. Baldwin, Jr. Mr. Baldwin functioned most effectively, attending depositions, reviewing documents, and resolving privilege questions as they arose. Without Mr. Baldwin's assistance, discovery would not have proceeded as smoothly as it did.

As amended, Baltimore Scrap's complaint advances seven counts as follows: (i) federal antitrust violations of the Sherman Act, 15 U.S.C. § 1; (ii) state antitrust violations of Maryland's antitrust law, Md. Code Ann. Com. Law II § 11–204 et seq.; (iii) malicious use of process; (iv) abuse of process; (v) tortious interference with prospective advantage; (vi) fraud; and (vii) conspiracy.

---

**23.** During the summer of 1993, Irwin and I.D. Shapiro communicated directly about Irwin's legal fees for the appeal. *See* Plaintiff's Exh. 31. It is unclear from the record whether the Marlen Trading reimbursement scheme continued during this period.

### III. Analysis

#### A. Summary Judgment Standard

Summary judgment standards apply equally to antitrust cases as to others. *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 468, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *Thompson Everett, Inc. v. National Cable Advertising, L.P.*, 57 F.3d 1317, 1322 (4th Cir. 1995). The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In order to survive summary judgment, the non-moving party must present evidence from which a reasonable jury could return a verdict in its favor. *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 768, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The complexity of antitrust cases does not make summary judgment inappropriate. On the contrary, Rule 56 may prove a particularly appropriate and useful tool for sorting out the "unusual entanglement of legal and factual issues frequently presented in antitrust cases... [and] is favored as a mechanism to secure the just, speedy and inexpensive determination of a case, when its proper use can avoid the cost of

trial." *Thompson Everett*, 57 F.3d at 1322 (citations omitted).

The Court must take care not to foreclose trial when the case presents genuinely disputed, material facts. Nevertheless, as the Fourth Circuit made clear in *Thompson Everett*, (i) "the mere existence of some disputed facts does not require that a case go to trial," and (ii) "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the *quality and quantity* of the evidence offered to create a question of fact must be adequate to support a jury verdict." *Id.* at 1323 (citations omitted) (emphasis added).[24]

#### B. Noerr–Pennington Immunity

##### 1. Background

■ The central premise of *Noerr–Pennington*[25] immunity is that those who petition government for redress are generally immune from antitrust liability. *See Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 56, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) ("*PRE* "). The doctrine extends to use of the courts. *See California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). Absent aggravating "plus factors," a party, even with anti-competitive intent, may provide clandestine support for litigation instigated by another party without incurring liability. *See, e.g., Liberty Lake Investments Inc. v. Magnuson*, 12 F.3d 155, 159 (9th Cir.1993); *Opdyke Investment Co. v. City of Detroit*, 883 F.2d 1265, 1273 (6th Cir.1989); *City of Cleveland v.*

---

**24.** Thus, "if the evidence is merely colorable or not significantly probative, it may not be adequate to oppose entry of summary judgment.... While we have recognized generally that when considering a motion for summary judgment, the district court must draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion, we hasten to add that those inferences must, in every case, fall within the range of reasonable probability and *not be so tenuous as to amount to speculation or*

*conjecture.*" *Thompson Everett*, 57 F.3d at 1323 (citations omitted)(emphasis added).

**25.** The doctrine was first developed by the Supreme Court in the legislative and executive context in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and United *Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

*Cleveland Electric Illuminating Co.,* 734 F.2d 1157, 1162 (6th Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). In *Opdyke,* the Sixth Circuit held: "[I]t would avail an antitrust plaintiff nothing to show that the defendant had surreptitiously caused a front man to institute a lawsuit against the plaintiff, even if the suit proved to be without merit, absent a showing of clear abuse of process." 883 F.2d at 1273 (citing *City of Cleveland,* 734 F.2d at 1163).

The defendants concede that their conduct was anti-competitive, but assert that it is protected by the *Noerr–Pennington* doctrine. The plaintiffs disagree. Citing two exceptions to the doctrine, they point out that *Noerr* immunity does not protect: (i) sham litigation; or (ii) litigation based on fraud. They argue that the defendants' actions during both the 1991 and 1992 appeals fall within these exceptions. The applicability of the two exceptions will be examined in turn.

### 2. The Sham Exception

The Supreme Court set out a two-part test for the "sham" exception to the *Noerr–Pennington* doctrine in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) ("*PRE*"). The Court held that a court may examine a litigant's subjective motivation only if the challenged litigation is "objectively baseless":

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr,* and an antitrust claim premised on the sham exception must fail. Only if the challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of a sham, the court should focus on whether the

baseless lawsuit conceals "an attempt to interfere *directly* with the business relationships of a competitor," through the "use of the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon."

*PRE,* 508 U.S. at 60–61, 113 S.Ct. 1920 (footnote and citations omitted).

The Court also cautioned in a footnote that an unsuccessful suit should not automatically be viewed as meritless:

> A winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham. On the other hand, when the antitrust defendant has lost the underlying litigation, a court must "resist the understandable temptation to engage in post hoc reasoning by concluding" that an ultimately unsuccessful "action must have been unreasonable or without foundation."

*Id.* at 60 n. 5, 113 S.Ct. 1920 (citations omitted).

The plaintiff urges that the defendants' actions are unprotected by *Noerr–Pennington* because they fall within the "sham" litigation exception. BSC argues that the 1992 appeal was both objectively baseless and subjectively motivated to interfere with business relations through the use of a governmental process.

■ The Court must first determine if the issues raised in the zoning appeal were objectively baseless. If not, the defendants' subjective motivation in bringing the suit is irrelevant. BSC urges that the following arguments made during the 1992 appeal were frivolous:

### a. Standing

Baltimore Scrap asserts that the defendants' 1992 appeal was objectively baseless because the citizens groups lacked standing to appeal. BSC adds that Gloria Sipes's motion to intervene on October 13, 1992 was also objectively baseless because it was filed out of time. In support of its argument, BSC points to deposition testimony and contemporaneous notes of Irwin

and his associates showing they knew standing was problematic. As its strongest claim, BSC cites the opinion of the Court of Special Appeals: "[t]he Organizations did not have standing, and Sipes did not file a timely appeal. Sipes simply could not use Rule 2–214 to resuscitate a case that was dead on arrival in the circuit court." *Sipes*, 99 Md.App. at 99, 635 A.2d 86.

Because the citizens' standing argument was ultimately rejected on appeal does not mean that it was devoid of merit. It must be borne in mind that Judge Ward, after reviewing the briefs and hearing the arguments of counsel, accepted the citizens' argument.[26] Chief Judge Hammerman stated that he had independently researched the standing issue and would likely have agreed with Judge Ward if called upon to rule. *See* DJJ Exh. C19 at 4–5. In reaching its decision on the timeliness of Sipes's intervention, the Court of Special Appeals stated it was making a "logical extension" of its standing rule. *Sipes*, 99 Md.App. at 94, 635 A.2d 86. The section of the Court of Special Appeals's opinion addressing the standing and intervention issues consumes 12 pages. *See id.* at 87–99, 635 A.2d 86. Clearly, the standing and intervention issues were not meritless questions of law to be summarily rejected. Thus, they were not "objectively baseless."

26. Although no transcript of the December 7, 1992 hearing before Judge Ward exists, the plaintiff has not raised any objection to the conduct of the hearing.

27. The Fifth Circuit has noted: "[T]o the extent the litigant has a reasonable basis for believing that his claim of standing might be accepted by the court, and thus that he will have the right to participate in the litigation process and obtain relief, he will be protected by *Noerr–Pennington* even though he ultimately loses." *In re Burlington Northern, Inc.*, 822 F.2d 518, 530 (5th Cir.1987). The *Burlington* court went on to observe that only a party advocating a patently frivolous standing argument would lose *Noerr–Pennington* protection.

28. Analyzing this argument requires a brief review of the procedural history of the case.

As their deposition testimony and contemporaneous notes demonstrate, Irwin and his associates were aware that they faced a difficult legal battle to establish standing. No evidence suggests, however, that they considered the standing argument hopeless. Irwin's success before two judges of the Circuit Court for Baltimore City demonstrates a reasonable basis for his litigation position. Under the objective standard enunciated in *PRE*, the subjective views of the defendants are not relevant as long as the legal standing argument urged by Irwin had objective merit, which it did.[27]

b. The Procedural Nature of the Zoning Appeals

Baltimore Scrap also argues that the citizens' zoning appeal was objectively baseless because it raised only procedural objections to the BMZA's decision, rather than challenging the substantive merits of BSC's application. BSC asserts that because the citizens only raised procedural objections, their appeal was in bad faith, as the citizens knew, or should have known, that the construction permit would ultimately be granted after the procedural defects were cured. The citizens were thus fighting a reargued stalling action, which BSC argues should not be protected by *Noerr–Pennington*.[28]

As discussed in Section II, *supra*, the BMZA rejected BSC's application on environmental grounds in November 1991. After modifying its application by proposing to add an oil/water separator and to pave the site with concrete, BSC reapplied the following year. The BMZA approved this second application on August 6, 1992.

Under Maryland law, a court reviews a zoning board's decision to determine if the decision was supported by "substantial evidence." *See, e.g., Aaron v. City of Baltimore*, 207 Md. 401, 406, 114 A.2d 639 (1955). In their appeal, the citizens did not attack the merits of the BMZA's environmental findings. They instead objected to alleged defects both in BSC's second application (i.e. that the second application was not significantly different from the first) and in the BMZA's approval of BSC's second application (i.e. that BSC's

The Court finds several flaws in BSC's argument. First, BSC argues that under Maryland law, the BMZA would have had no choice but to reapprove BSC's application on remand because the citizens groups had presented no substantive evidence in opposition to the proposed shredder. *See, e.g., Turner v. Hammond,* 270 Md. 41, 55, 310 A.2d 543 (1973) ("[I]f there is no probative evidence of harm or disturbance ... a denial of an application ... is arbitrary, capricious, and illegal." (citation omitted)). But as Chief Judge Hammerman put it at the January 7, 1993 hearing, on remand Baltimore Scrap would "have to start all over again before the Board." [29] DJJ Exh. C19 at 29. On remand, the slate would have been wiped clean and the citizens would have had a new opportunity to oppose the shredder on environmental grounds. They would have been able to present new evidence and make new arguments. It is, therefore, not a legal certainty that the BMZA would have reached the same result.

Second, procedural objections are not necessarily frivolous. Procedural rules exist so that legal questions will be decided in a fair and orderly manner. The citizens were entitled to complain that the BMZA had not followed the proper procedure. The procedural objections that the citizens raised can hardly be classified as obstructionist nitpicking. Aside from the proposed paving and oil/water separator, BSC's 1992 application was in many ways similar to its 1991 application. The Board nevertheless found that the applications were "substantially" different, and so the second application was considered and approved less than one year after the first

one was rejected.[30] At the January 7, 1993 hearing, Chief Judge Hammerman found the BMZA's determination on the matter supported by substantial evidence. Nevertheless, he also stated that if he were reviewing the decision under a less restrictive standard he would not necessarily "find the same way as the Board." Thus, the citizens' objection on this issue was not objectively baseless.

Third, the BMZA's original August 6, 1992 decision was confusing and would not have been upheld absent the Gadhia affidavit. At the January 7, 1993 hearing Chief Judge Hammerman stated he was not convinced that the erroneous classification of the BSC shredder as a MIRF was a mere "slip of the tongue." DJJ Exh. C19 at 28. The citizens cannot be faulted for having taken the appeal initially. They also cannot be faulted for later arguing that the Gadhia affidavit was inadmissible. The affidavit was not part of the agency record, and there were legitimate questions as to whether the reviewing court could consider it.[31]

c. The Relevance of the Defendants' Concealment

Baltimore Scrap next argues that the successes of the citizens groups before Judge Ward and Chief Judge Hammerman should be discounted because the involvement of the defendants was not known to the court at the time. This argument fails because under *PRE* only objectively baseless litigation is a sham. Baltimore Scrap fails to show how the legal questions raised by the citizens groups in the zoning appeal

---

shredder was improperly classified as a MIRF).

**29.** Because Chief Judge Hammerman found that the Board's determination that BSC's second application was substantially different than the first was supported by substantial evidence, that issue was not subject to review on remand.

**30.** As explained in Part II.D, *supra,* once an application is rejected by the BMZA, the ap-

plicant must normally wait one year before reapplying, unless the second application is "substantially" different from the first.

**31.** If BSC's contention were accepted, any litigant raising procedural arguments on appeal, even if the appeal were successful in forcing a remand, would face a claim that the appeal was taken in bad faith if it appeared likely that the procedural defect would be cured after remand.

would have lacked objective merit had the role of the defendants been known.

As discussed *supra*, the questions of standing, of whether BSC's second application was substantially different from the first, of whether the BMZA applied the proper standard in approving BSC's application, and of whether the admission of the Gadhia affidavit was permissible were all questions with objective legal merit. As the Supreme Court has instructed, under *Noerr–Pennington* the merits of a case are to be examined under an objective standard. Because a case that is not objectively baseless cannot give rise to antitrust liability, the defendants' involvement in bankrolling the zoning appeal is not actionable.

### 3. The Fraud Exception

The Supreme Court has noted that "[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process." *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 512, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). In that case, the plaintiff trucking company sued a competitor that had regularly challenged the plaintiff's application for permits. The plaintiff charged that the defendants had conspired to block the plaintiff's applications for operating rights by instituting " 'proceedings and actions . . . with or without probable cause, and regardless of the merits of the cases.' " *Id.* at 512, 92 S.Ct. 609 (citation omitted). According the plaintiff, the defendants' deliberate misconduct frustrated the plaintiff from using administrative agencies and the courts to obtain operating rights. *See id.* at 518, 92 S.Ct. 609 (Stewart, J., concurring in the judgment).

The District Court dismissed the case for failure to state a claim. On appeal, the Ninth Circuit reversed. On certiorari review, the Supreme Court upheld the Ninth Circuit, holding that these tactics, if proven, were not protected by *Noerr–Pennington*. The Court drew on several earlier cases in support of its holding, noting that unethical conduct in the adjudicatory process often results in sanctions. *See, e.g., Walker Process Equipment, Inc. v. Food Machinery and Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965) (finding use of a fraudulently obtained patent to block a competitor may trigger antitrust liability).

Courts have had some difficulty distinguishing the fraud exception from the sham exception. *Cf. Nobelpharma AB v. Implant Innovations, Inc.* 141 F.3d 1059, 1071 (Fed.Cir.1998) (noting *PRE* and *Walker Process* are alternative legal theories which "may be applied to the same conduct"). Although the Supreme Court clarified the requirements for sham litigation in *PRE*, it provided considerably less definition of the fraud exception. In a frequently cited footnote, the *PRE* Court took pains to leave open whether *Noerr* permits the imposition of antitrust liability due to fraud, absent sham litigation.[32]

Subsequent to *PRE*, lower courts have grappled with the meaning of the fraud exception. This Court finds persuasive the Ninth Circuit's analysis in *Liberty*

---

**32.** The Court wrote:

> In surveying the "forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations," we have noted that "unethical conduct in the setting of the adjudicatory process often results in sanctions" and that "misrepresentations condoned in the political arena are not immunized when used in the adjudicatory process." We need not decide here whether, and, if so, to what extent *Noerr* permits the imposition of antitrust

liability for a litigant's fraud or other misrepresentations. *Cf.* Fed.R.Civ.P. 60(b)(3) . . .; *Walker Process*, 382 U.S. at 179–80, 86 S.Ct. 347 (Harlan, J., concurring).

*PRE*, 508 U.S. at 61–62 n. 6, 113 S.Ct. 1920 (some citations omitted).

Defendants suggest that footnote 6 could be interpreted to cast doubt on the survival of the fraud exception after *PRE*. While such an interpretation is plausible, it has not been adopted by any of the courts of appeal applying *PRE* and will not be adopted here.

*Lake Investments Inc. v. Magnuson,* 12 F.3d 155 (9th Cir.1993).[33] In that case, the Ninth Circuit read footnote 6 to mean that a defendant's fraudulent behavior will strip it of *Noerr* immunity if there is "deceptive conduct which goes to the core of a lawsuit's legitimacy." *Liberty Lake,* 12 F.3d at 158. *See also Hydranautics v. Filmtec Corp.,* 70 F.3d 533, 538 (9th Cir.1995) (finding a fraudulently obtained patent nullifies antitrust immunity); *Whelan v. Abell,* 48 F.3d 1247, 1255 (D.C.Cir.1995) (giving of deliberately false statements to state securities officials not protected by *Noerr* immunity).

The *Liberty Lake* court also found that there is no exception to *Noerr* immunity absent "proof that a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy." 12 F.3d. at 159. The soundness of this interpretation is further supported by *PRE*'s emphasis in footnote 6 on Justice Harlan's concurrence in *Walker Process,* stressing that the Court's holding reached only "deliberate fraud." 382 U.S. at 179–80, 86 S.Ct. 347 (Harlan, J., concurring).

 The plaintiff points to instances in which, it contends, the defendants' actions amounted to fraud, depriving the zoning appeal of its legitimacy. This Court disagrees. Although the defendants' actions were unseemly, perhaps unethical, they do not rise to the level of fraud necessary to vitiate *Noerr* immunity. The plaintiff's central problem, which it is unable to overcome, is that the arguments presented by the citizens groups were legitimate, both objectively and subjectively.[34]

### a. Fraud on the Citizens' Groups

Baltimore Scrap argues that the defendants defrauded the citizens groups by failing to disclose the defendants' role in funding and steering the 1992–93 appeal. Although the purposeful concealment of the defendants' role was wrong,[35] BSC's argument fails. Several leaders of the citizens groups testified on deposition that they were "upset" by the April 1993 revelation that their benefactor was a metal shredding company. Yet, none of the citizens groups or their leaders have ever contended they were defrauded. Moreover, after the April 3 meeting in which Irwin revealed the identity of the funders, all of the groups elected to accept the financial aid and continue their appeal to the Court of Special Appeals.[36]

Second, none of the deceptions the defendants committed on the citizens groups deprived the litigation of its legitimacy. The archetypal case of fraud, *Walker Process,* involved a fraudulently obtained patent. Without the patent, there was no case. Here, by contrast, the central questions raised in the zoning appeal (did the

---

**33.** Subsequent to *PRE,* the Fourth Circuit has not yet discussed the meaning of the fraud and sham exceptions.

**34.** The plaintiff acknowledges that the citizens groups were honestly opposed to the Baltimore Scrap shredder on environmental grounds. Pl. Mem. Opp. Sum. J. at 62 n.19.

**35.** It is unclear when Irwin became aware of United's role in funding the zoning appeal. In his deposition, he testified that Isaac Neuberger and Sam Wood told him in August 1992 that he would be compensated if he represented the citizens in the zoning appeal. Irwin stated he was under the impression that businesses would pay him, but he was "not especially" interested in knowing the identity of the businesses. Dep. of David Irwin at 27.

**36.** The plaintiff argues that, based on statements made in her deposition, Gloria Sipes, the individual plaintiff in the zoning appeal, would have declined to participate in the litigation had she known the true source of funds. Ms. Sipes did not state explicitly that she would have declined. Moreover, had Sipes demurred, the defendants could have found another lead plaintiff such as Mary Rosso or Doris McGuigan. For example, Ms. Rosso, leader of the Maryland Waste Coalition, testified at deposition that although she was "not happy" to find out United was behind the funding, she "really didn't give a darn." Dep. of Mary Rosso at 60.

BMZA use the appropriate standard, and then later, did the Circuit Court err in accepting the Gadhia affidavit?) were legitimate, albeit somewhat thin, legal issues.

### b. Fraud on the Courts

BSC points to Irwin's arguments before Chief Judge Hammerman following the exposure of the "errant fax." In his reply brief, Irwin denied that United was the "real party in interest" in the case. When Chief Judge Hammerman questioned Irwin on these subjects during the April 23 hearing, Irwin's answers were evasive. In the same reply brief, Irwin also stated that the citizens groups lacked funds to post a bond. In reality, of course, the defendants, who were funding the case, had ample financial resources.

Baltimore Scrap argues that Irwin's written and oral representations to Chief Judge Hammerman constitute fraud. Irwin's behavior may well have violated the spirit, if not the letter, of the Rules of Professional Conduct. *See, e.g., Md. Rules of Professional Conduct* 3.3, Candor Toward the Tribunal. But it is neither the role of antitrust law, nor of this Court, to regulate the conduct of attorneys appearing in the Circuit Court for Baltimore City. As a general rule, ethical codes do not create standards of liability for lawyers. *See, e.g., Schatz v. Rosenberg*, 943 F.2d 485, 492 (4th Cir.1991). Also, when Chief Judge Hammerman denied the citizens' Motion to Stay pending appeal to the Court of Special Appeals on April 23, 1993, he stated that, despite Irwin's denials, he discerned the defendants' hand in the appeal.[37]

The courts therefore knew of the defendants' involvement at a relatively early stage of the zoning appeal. There is no evidence that any judicial rulings were predicated upon the misassumption that the citizens alone were pressing the appeal. In addition, Baltimore Scrap has produced no evidence to show that the zoning appeal would have been shorter had the courts known from the outset that the defendants were secretly advising and funding the appeal.

BSC also asserts that the defendants committed fraud on the courts by allowing the citizens groups to raise environmental concerns in their 1992 appeal. This argument has two parts. First, BSC contends that the defendants knew that BSC's shredder would be equipped with state-of-the-art pollution controls and would pose no environmental threat to the community.[38] Second, according to BSC, the defendants therefore acted fraudulently by authorizing Irwin to argue on behalf of the citizens that the BSC shredder posed an environmental risk.

The Court rejects this argument. Baltimore Scrap made informal presentations to the community groups to attempt to persuade them that the proposed shredder was equipped with environmental controls and posed no pollution risk. BSC also offered testimony to this effect at the BMZA hearings. The citizens, however, were unpersuaded. For example, the citizens groups' September 4, 1992 petition to the Circuit Court for Baltimore City, in which they sought reversal of the BMZA's approval, stated: "Appellants are concerned about the health risk posed by Brooklyn's proposed shredder, since large quantities of dust, metal fragments and disturbingly loud noises are the by-products of such an operation." DJJ Exh. C2 at 4.

BSC has produced no evidence that the citizens' environmental concerns were

---

**37.** Had the defendants' involvement remained concealed throughout the litigation the analysis might be different.

**38.** In support of its contention, BSC cites evidence presented at the BMZA hearing supporting the environmental soundness of the proposed shredder. It also points out that the defendants themselves intended to replace their own shredder with one with environmental safeguards similar to those of the BSC shredder. *See* Pl. Mem. Opp. Sum. J. at 49–54.

false or fraudulent. It is undisputed that the environmental issues raised by the citizens originated with the citizens, not the defendants. It is also undisputed that the citizens genuinely believed in the environmental concerns they raised. The environmental issues are of the type that concerned citizens are permitted to raise in opposition to a zoning application. There is no evidence that the defendants planted spurious environmental questions in the minds of the citizens. Accordingly, the defendants committed no fraud on the courts in financing the citizens' appeal.

c. Fraud on Other Agencies

The plaintiff further claims that the defendants perpetrated a fraud during the 1991 zoning appeal by having · Attorney Timothy Henderson submit a report to the Baltimore Department of Planning and Zoning. The report, authored by DJJ, stated that the shredding capacity of the Baltimore scrap market exceeded demand. According to BSC, this report was false.[39]

Even if BSC could establish that the report contained deliberately false information, the plaintiff has failed to demonstrate fraud. Regardless of the defendants' intent, there is no evidence that the report played a role in the BMZA decision. The Planning and Zoning Department memo concerning the Baltimore Scrap application was sent to the BMZA on October 24, 1991. *See* DJJ Exh. A3. The defendants' report was not received by the Planning and Zoning Department until November 19, the day of the BMZA hearing. Mary Dolan, head of the Coastal Resources Division of the Department of Planning and recipient of the report, stated at her deposition that she did not transmit the report to the BMZA. Dep. of Mary Dolan at 30. Finally, the unnamed BMZA member who cast the vote that denied the plaintiff's 1991 application cited environmental concerns, not size of the market, as the reason for the member's opposition.

The defendants' report was therefore not material to the 1991 BMZA decision. Without reliance on the report by the BMZA, there can be no fraud. *Cf. Interstate Properties v. Pyramid Co.*, 586 F.Supp. 1160, 1163 (S.D.N.Y.1984). In *Interstate Properties,* the court found moral fault with a party's deliberate misrepresentation as to its financial interest in opposing a construction application. The misrepresentation was not actionable, however, because the state denied the application on environmental grounds. Moreover, as the Ninth Circuit observed, "a party should not as a matter of course have the accuracy of its testimony in a prior judicial proceeding subject to subsequent and collateral attack in the form of an antitrust suit." *Omni Resource Development Corp. v. Conoco, Inc.*, 739 F.2d 1412, 1414 (9th Cir.1984)(Kennedy, J.).

As evidence of fraud, the plaintiff also points to handwritten notes of DJJ Vice President David Wulff stating "I.D. influenced that." *See* Plaintiffs' Exh. 25. "I.D." apparently refers to I.D. Shapiro and "that" refers to the 1991 denial of Baltimore Scrap's application. The central tenet of *Noerr–Pennington* immunity is that attempts to influence the process of government, even for anti-competitive purposes, are protected absent fraud. There is no evidence Shapiro influenced the 1991 appeal through fraudulent means such as bribery.

d. Fraud on the Plaintiff

The plaintiff argues the defendants committed fraud by attempting to lull the plaintiff into a false sense of security by suggesting that the defendants were not involved in the citizens groups' lawsuit. One of BSC's attorneys, Stanley Fine, testified at deposition that Isaac Neuberger

---

**39.** The parties dispute the accuracy of the report. For summary judgment purposes, the Court will accept Baltimore Scrap's contention that DJJ's methodolgy was flawed. Even

so, the plaintiff cannot prove fraud; rather, it only can establish that the report was inaccurate. There is no evidence that the DJJ report contained deliberately false information.

told him in January 1993 that Irwin was "nosing around" the United shredder on Wilkens Avenue, looking for environmental problems.[40] According to Fine, Neuberger's representations were patently deceitful. As of January 1993, Irwin was working with Neuberger and being paid by United. Neuberger's misrepresentations implied that United and BSC had a common enemy in the citizens groups. Fine then revealed to Neuberger elements of BSC's legal strategy in the zoning appeal, Fine testified. *See* Dep. of Stanley Fine at 227–30; Plaintiff's Exh. 18.

Neuberger's alleged conduct, although reprehensible, would not strip the defendants of *Noerr–Pennington* protection. Any actions the defendants may have taken to put the plaintiff "off the scent" did nothing to deprive the lawsuit of its legitimacy, and are thus protected under *Noerr*. To establish fraud, BSC must show that Neuberger's alleged knowledge of BSC's strategy prolonged the appeal and caused material harm to BSC. Baltimore Scrap has not established what it would have done differently had Neuberger not contacted Fine.

e. Maryland Zoning Law

The plaintiff contends that the zoning appeal lacked all legitimacy under Maryland law. As support, it cites a line of Maryland cases holding that a zoning appeal aimed solely at preventing competition is illegitimate as matter of law. *See, e.g., Lucky Stores v. Board of Appeals,* 270 Md. 513, 312 A.2d 758 (1973). The plaintiff's argument is misplaced. In *Lucky Stores,* the Maryland Court of Appeals noted that "a person whose sole interest for objection to [a] Zoning Board's action is to prevent competition with his established business is not a person aggrieved." 270 Md. at 528, 312 A.2d 758. In the instant case, however, the appeal was brought by the citizens groups to address

environmental concerns. All parties agree that the citizens held honest objections to BSC's proposed shredder.

*4. The State Law Claims*

a. State Antitrust Claim

■ Interpretation of Maryland's antitrust law is to be "guided by the interpretation given by the federal courts to the various federal statutes dealing with the same or similar matters." Md.Code Ann. Com. Law II § 11–202(a)(2). Because the defendants are immune from federal antitrust liability, they are likewise immune from liability under Maryland's antitrust statute, Md.Code Ann. Com. Law II § 11–204. *Cf. Hinkleman v. Shell Oil Co.,* 962 F.2d 372, 379 (4th Cir.1992) ("[S]tate claims under section 11–204(a) and (b) must fail where those same claims would also fail under similar federal law") (citation omitted).

b. State Common Law Claims

The plaintiff asserts a number of state common law claims: malicious use of process, abuse of process, tortious interference with prospective advantage, fraud, and conspiracy. Because the defendants' behavior is protected from antitrust liability by the First Amendment under *Noerr–Pennington,* it is likewise protected from state common law liability.

The plaintiff does not dispute that if *Noerr–Pennington* immunity applies to the antitrust claims it likewise applies to the state common law claims. The Fourth Circuit has noted that the policies behind *Noerr–Pennington* immunity include preserving the "first amendment right to petition government officials." *Ottensmeyer v. Chesapeake & Potomac Telephone Co.,* 756 F.2d 986, 993 (4th Cir.1985). In order to protect First Amendment rights, courts have recognized that *Noerr* immunity applies to common law claims such as those

---

**40.** It is unclear from the record who initiated the January 1993 conversation between Fine and Neuberger.

raised by Baltimore Scrap. *See, e.g., Brownsville Golden Age Nursing Home, Inc. v. Wells,* 839 F.2d 155, 159–160 (3d Cir.1988) (recognizing applicability of the doctrine to conspiracy, abuse of process, and other claims); *Havoco of Am., Ltd. v. Hollobow,* 702 F.2d 643, 649 (7th Cir.1983) (applying *Noerr* protection to claims of tortious interference with business relationships).

## C. Statute of Limitations

The defendants also assert that the plaintiff's claims are barred by the relevant statute of limitations. Because the defendants' conduct is protected by *Noerr–Pennington* immunity, this issue need not be reached.

### IV. Conclusion

For the reasons stated herein, the Court shall by separate Order grant the DJJ defendants' motion for summary judgment on the basis of Noerr–Pennington immunity, grant the Shapiro defendants' motion for summary judgment on the basis of Noerr–Pennington immunity, and deny as moot the Shapiro defendants' motion for summary judgment as to limitations.