PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

BALTIMORE SCRAP CORPORATION,
formerly known as Brooklyn
Salvage Corporation,
              *Plaintiff-Appellant,*

              v.

THE DAVID J. JOSEPH COMPANY, t/a
United Iron & Metal Company;
DAVID J. WORKUM, III; JOHN DOES
1-10; I. D. SHAPIRO; JAMES SHAPIRO;
CHARLES BAUM; UNITED HOLDINGS
COMPANY, INCORPORATED; UNITED
OPERATING COMPANY, INCORPORATED;
UNITED INVESTMENT ENTERPRISES
PARTNERSHIP,

              *Defendants-Appellees.*            No. 00-1141

FRANCIS X. DUGGAN; RICH &
HENDERSON, PC; DONALD LEVENSON;
MARLEN TRADING COMPANY; ISAAC
M. NEUBERGER; THOMAS M. WOOD,
IV; WARREN K. RICH; TIMOTHY R.
HENDERSON; DAVID B. IRWIN,

              *Movants.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Benson E. Legg, District Judge.
(CA-96-827-L)

Argued: November 1, 2000

Decided: January 18, 2001

Before WILKINSON, Chief Judge, WILLIAMS, Circuit Judge,
and Frank J. MAGILL, Senior Circuit Judge of the
United States Court of Appeals for the Eighth Circuit,
sitting by designation.

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Williams and Senior Judge Magill joined.

## COUNSEL

**ARGUED:** Lewis A. Noonberg, PIPER, MARBURY, RUDNICK &
WOLFE, L.L.P., Baltimore, Maryland, for Appellant. G. Jack Don-
son, TAFT, STETTINIUS & HOLLISTER, L.L.P., Cincinnati, Ohio;
Carter G. Phillips, SIDLEY & AUSTIN, Washington, D.C., for
Appellees. **ON BRIEF:** Kathleen A. Ellis, PIPER, MARBURY,
RUDNICK & WOLFE, L.L.P., Baltimore, Maryland; Charles S.
Hirsch, Robert A. Scott, BALLARD, SPAHR, ANDREWS &
INGERSOLL, L.L.P., Baltimore, Maryland, for Appellant. Daniel R.
Warncke, TAFT, STETTINIUS & HOLLISTER, L.L.P., Cincinnati,
Ohio; Robert J. Carson, Gary R. Jones, Baltimore, Maryland, for
Appellees; Thomas M. Wood, IV, Allan P. Hillman, NEUBERGER,
QUINN, GIELEN, RUBIN & GIBBER, P.A., Baltimore, Maryland,
for Appellees.

## OPINION

WILKINSON, Chief Judge:

This antitrust case stems from a protracted dispute over Baltimore
Scrap Corp.'s attempt to install a scrap metal shredder in Baltimore,
Maryland in 1991. Baltimore Scrap alleges that the defendants vio-
lated the Sherman Act, 15 U.S.C. § 1 (1994), by surreptitiously
financing litigation in state court in order to prevent or delay Balti-
more Scrap's entry into the market. The defendants argue that the
*Noerr-Pennington* doctrine immunizes those who petition the courts

from antitrust liability. The district court ruled that although the defendants' conduct was wrong, it was nonetheless protected by *Noerr-Pennington*. *See Baltimore Scrap Corp. v. The David J. Joseph Co.*, 81 F. Supp.2d 602, 603 (D. Md. 2000). Because neither the sham exception nor the fraud exception to *Noerr-Pennington* immunity applies here, we affirm the judgment of the district court.

I.

On July 15, 1991, Baltimore Scrap leased land in the city of Baltimore in order to install a metal shredder there. Baltimore Scrap's proposed shredder caused great concern among two groups. The first was comprised of citizen associations of Baltimore who opposed the shredder on environmental grounds. These organizations voiced their opposition to the Maryland Department of Environment and to the Mayor of Baltimore in August of 1991.

The defendants, including The David J. Joseph Co. (DJJ), I.D. Shapiro, and the Shapiro family, composed the second group. The defendants controlled the only other metal shredder in the Baltimore area. DJJ and Shapiro wanted to ensure that their shredder maintained its monopoly in that area. Unlike the citizen groups, however, DJJ and Shapiro did not publicly voice their concerns about Baltimore Scrap's proposed shredder. Indeed, until their role was inadvertently revealed in late March of 1993, the defendants' plan to prevent Baltimore Scrap from building a shredder was a closely-guarded secret.

In September of 1991, Baltimore Scrap applied for a zoning permit from the Baltimore City Board of Municipal and Zoning Appeals. In November, the leaders of the citizen groups testified against the permit. One week later, the Board denied Baltimore Scrap's application. Baltimore Scrap appealed this decision to the Baltimore City Circuit Court, which upheld the Board.

In May of 1992, Baltimore Scrap filed a new zoning application with the Board. Because the Baltimore zoning code does not allow the Board to consider "substantially the same proposal" until twelve months after the previous application was denied, Baltimore Scrap changed its application to add new protections against soil contamination at the site. The Board ruled that the application was different

enough to warrant a new hearing even though twelve months had not elapsed since the previous denial of a permit. The Board then approved a permit for Baltimore Scrap on August 6, 1992.

At this point, Shapiro decided to secretly fight the approval of the permit. Shapiro's attorney contacted another lawyer, David Irwin, to handle the appeal. An employee from a different company co-owned by Shapiro contacted Gloria Sipes. Sipes was the president of one of the citizen groups, the Community of Curtis Bay Association. The employee told Sipes that local businesses would pay for an attorney if the citizen groups wanted to appeal the Board's decision. The employee told Sipes to contact David Irwin for the appeal. The caller did not reveal her identity, or who she represented. Sipes consulted with the other citizen groups, and they decided to accept the support of their unknown benefactor. The citizen organizations did not ask who was funding the appeal and "did not care" who paid the lawyer.

Irwin filed his appeal on behalf of the citizen groups on August 27, 1992. Irwin understood that DJJ and Shapiro controlled the appeal. Baltimore Scrap moved to dismiss the appeal based upon the citizen groups' lack of standing. After the statutory appeal period expired, Sipes moved to intervene in the lawsuit as an individual party. Judge Ward of the Baltimore City Circuit Court ruled that the citizen groups and Sipes all had standing, and granted Sipes' motion to intervene. He thus denied Baltimore Scrap's motion to dismiss.

Chief Judge Hammerman, also of the Baltimore City Circuit Court, heard the citizen groups' appeal on the merits on January 7, 1993. He agreed with Judge Ward that Sipes' motion to intervene was timely. After originally ruling for the citizen groups on the merits, Chief Judge Hammerman eventually affirmed the Board's decision to grant Baltimore Scrap a permit once the Board clarified a technical point. The citizen groups filed a motion with Chief Judge Hammerman to stay his decision pending appeal.

Throughout this time, DJJ and Shapiro left no public trace of their involvement in the lawsuit. In late March, however, a so-called "errant fax" exposed the role of the defendants. This fax was supposed to go to a lawyer working for DJJ and Shapiro, but instead was sent to a friend of Baltimore Scrap's president. On April 3, Irwin met with

representatives from the citizen groups involved in the lawsuit. He told them that DJJ and Shapiro were funding the litigation. He asked them whether they wanted to continue with the appeal. The citizen groups decided to keep pursuing the appeal, despite the knowledge of DJJ and Shapiro's involvement.

Baltimore Scrap argued in its opposition to the motion to stay that the lawsuit was a fraud because DJJ and Shapiro were the real parties in interest. Irwin responded in his pleadings that the notion that the defendants directed the conduct of this case or drafted the previous motion was "preposterous, inflammatory, and not based in reality." Irwin emphasized in open court during an April 23 hearing on the motion to stay that the citizen groups were the only parties he represented. When Chief Judge Hammerman questioned Irwin about the errant fax, Irwin told the judge that nothing in the errant fax "says my law firm is involved with" DJJ and Shapiro. Irwin stated to the court, "I continue to deny, as my papers do, that I am representing anyone but the people represented here." Chief Judge Hammerman denied Irwin's motion to stay because he thought that the citizen groups did not have a likelihood of success on appeal. In reaching this decision, Chief Judge Hammerman observed that he saw the hand of the defendants in the lawsuit, and that "they have gone from the role of an interested observer to the role of an active participant."

Despite the denial of the motion to stay, the citizen groups appealed to the Maryland Court of Special Appeals. In a twelve-page opinion, the Court of Special Appeals denied the appeal. *See Sipes v. Board of Municipal and Zoning Appeals*, 635 A.2d 86 (Md. Ct. Spec. App. 1994). It called the case "dead on arrival in the circuit court" because the citizen groups did not have standing since they were neither an aggrieved party nor a taxpayer. *Id.* at 97; *accord id.* at 89. Although Sipes as an individual did have standing, her motion to intervene was time-barred as a logical extension of the citizen groups' lack of standing. *Id.* at 94. The citizen groups did not pursue an appeal from this decision. Baltimore Scrap's shredder became fully operational in July, 1993.

Baltimore Scrap sued DJJ, the Shapiro family, and the Shapiro family's companies. The complaint alleged violations of the Sherman Act, 15 U.S.C. § 1, violations of Maryland antitrust law, Md. Code

Ann. Com. Law. II §§ 11-204 et seq., and various state common law tort claims including malicious use of process, abuse of process, and fraud. The district court found that the defendants' actions were "deceitful," "underhanded," and "morally wrong." *Baltimore Scrap Corp.*, 81 F. Supp.2d at 603. Nevertheless, the district court dismissed Baltimore Scrap's claims because of the defendants' *Noerr-Pennington* immunity. *See id.* Baltimore Scrap now appeals.

## II.

The *Noerr-Pennington* doctrine guarantees citizens their First Amendment right to petition the government for redress without fear of antitrust liability. *See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136-39 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 669 (1965). In *Noerr*, the Supreme Court held that "the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." *Noerr*, 365 U.S. at 136. Indeed, the Court emphasized that "[t]he right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms." *Id.* at 138.

Antitrust law was thus not intended to impose a barrier between the people and their government. Because it is "neither unusual or illegal for people to seek action on laws in the hope that they may bring about an advantage to themselves and a disadvantage to their competitors," the Supreme Court has made clear that the Sherman Act generally does not prohibit the petitioning of public bodies for relief. *Id.* at 139. Indeed, an "anticompetitive purpose [does] not illegalize" concerted attempts to influence public officials "even though the resulting official action damaged other competitors at whom the conduct was aimed." *Pennington*, 381 U.S. at 669.

*Noerr-Pennington* immunity from antitrust laws extends to petitioning the courts as well. *See California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510-11 (1972). Federal antitrust law is thus generally not an appropriate means of collaterally attacking state judicial judgments because of *Noerr-Pennington*'s holding

that the rights of petition and association trump any anticompetitive effects that might occur from asking the government for redress. Any other rule would allow the specter of satellite litigation to restrict the primary right of citizens to seek justice from the judicial system.

### III.

*Noerr-Pennington* immunity from lawsuits has two main exceptions, however — "sham litigation" and, arguably, fraudulent litigation. *See Professional Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60, 61-62 n.6 (1993) (*PRE*); *accord Noerr*, 365 U.S. at 144. Baltimore Scrap argues that both exceptions operate to strip the defendants of any *Noerr-Pennington* immunity.

### A.

We address the sham exception to *Noerr-Pennington* immunity first. Sham litigation must meet a two-part test. *See PRE*, 508 U.S. at 60-61. First, the lawsuit must be objectively baseless. A lawsuit is objectively baseless only if "no reasonable litigant could realistically expect success on the merits." *PRE*, 508 U.S. at 60. If an objective party can "conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail." *Id.* By definition, a winning lawsuit is a "reasonable effort at petitioning for redress and therefore not a sham." *Id.* at 60 n.5. Second, in the event the challenged litigation is found to be objectively baseless, the lawsuit must further conceal an attempt to interfere directly with the business relationships of a competitor. *Id.* at 60-61. Because the litigation at issue in this case was not objectively baseless, our analysis stops after the first prong of the test.

Lawsuits are not objectively baseless simply because a litigant lost. In *PRE*, the Supreme Court held that Columbia Pictures had a reasonable basis for believing it might win a copyright infringement case despite the fact that the Ninth Circuit dismissed the lawsuit as a matter of law. *See PRE*, 508 U.S. at 63-65. The Court pointed to the fact that two other circuits expressly declined to follow the Ninth Circuit's holding as well as the criticism that the Ninth Circuit's opinion engendered among commentators. *See id.* Even in the absence of this

contrary authority, the Court held that Columbia Pictures would have been entitled to press a novel claim if a similarly situated litigant could have perceived some likelihood of success. *See id.* at 65.

Baltimore Scrap argues that the litigation was a sham because the defendants knew that the citizen groups did not have standing and Sipes did not timely move to intervene. Baltimore Scrap cites *In re Burlington Northern, Inc.*, 822 F.2d 518 (5th Cir. 1987), and *Landmarks Holding Co. v. Bermant*, 664 F.2d 891 (2d Cir. 1981), to support its claim. In *Burlington Northern*, railroad companies allegedly tried to prevent or delay the construction of a coal pipeline by engaging in sham petitioning of the courts. *See* 822 F.2d at 521. Some of the railroad companies knew that they had no standing or had no reasonable basis for asserting standing. Still, they joined in the lawsuit. *See id.* at 530. The court held that the defendants' actions were not protected by *Noerr-Pennington* because the litigation was baseless. *Id.* In *Landmarks Holding*, owners of a shopping mall sued a competing shopping mall knowing that they lacked the standing to do so. *See* 664 F.2d at 893. These owners also subsidized litigation by various citizens to stop the competing mall without the citizens' knowledge that the shopping mall owners were funding the lawsuit. *See id.* at 893-94. The court held that because all the lawsuits were meritless, *Noerr-Pennington* did not protect the defendants' actions. *See id.* at 896.

The case at bar differs substantially from both *Burlington Northern* and *Landmarks Holding*. First, both these cases were decided before the Supreme Court enunciated its test for sham litigation in *PRE*. Second, and more importantly, in both cases the defendants knew or reasonably should have known that they lacked standing and therefore that their claims were baseless.

In this case, an objective litigant could reasonably expect to achieve success on the merits. Although the zoning lawsuit was eventually dismissed due to lack of standing, Judge Ward ruled for the citizen groups on the standing issue and allowed Sipes to intervene. Chief Judge Hammerman indicated that after his independent research, he probably would agree with Judge Ward if he needed to rule on standing. The Court of Special Appeals disagreed, but only after making a "logical extension" of its intervention rule and after a

reasoned opinion. *Sipes*, 635 A.2d at 94. As the district court noted, the "success before two judges of the Circuit Court for Baltimore City demonstrates a reasonable basis" for the litigation position. 81 F. Supp.2d at 614. The fact that the Court of Special Appeals ultimately dismissed the lawsuit on the standing issue makes no difference in deciding whether an objective litigant could reasonably expect to have success on the merits. Judged by this latter standard, the zoning litigation was not a sham.

## B.

Baltimore Scrap maintains, however, that *Noerr-Pennington* analysis is inapplicable to this case because DJJ and the Shapiro family did not petition the government since they were not parties to the zoning litigation. Baltimore Scrap argues that *Noerr-Pennington* protects litigants only, not third parties who covertly funded the lawsuit. *See PRE*, 508 U.S. at 60 ("If an objective *litigant* could conclude that the suit is reasonably calculated to elicit a favorable outcome . . . .") (emphasis added).

*PRE* is not so restrictive as to protect only the litigant from later antitrust liability. *See Liberty Lake Investments, Inc. v. Magnuson*, 12 F.3d 155, 157-59 (9th Cir. 1993). The fact that a third party funded the litigation cannot govern the analysis of the objective merit of a lawsuit. *See id.* As the Sixth Circuit put it, "[I]t would avail an antitrust plaintiff nothing to show that the defendant had surreptitiously caused a front man to institute a lawsuit against the plaintiff, even if the suit proved to be without merit, absent a showing of clear abuse of process." *Opdyke Investment Co. v. City of Detroit*, 883 F.2d 1265, 1273 (6th Cir. 1989).

Baltimore Scrap again relies on *Burlington Northern* for the proposition that a third party who does not have standing to pursue a lawsuit in its own right does not receive *Noerr-Pennington* immunity. *See Burlington Northern*, 822 F.2d at 531. In *Burlington Northern*, Union Pacific Railroad did not join the litigation against the coal pipeline company as a party. However, it provided legal assistance to the state of Nebraska. Most parties, as well as the district court, did not know of Union Pacific's involvement in the lawsuit. *See id.* at 530-31. The court held that if Union Pacific did not have standing against the pipe-

line company in its own right, it would not receive the protection of *Noerr-Pennington*. *See id.* at 531 and n.11.

Baltimore Scrap argues that since the defendants in this case likewise did not have standing to pursue the appeal, they do not receive *Noerr-Pennington* immunity. We are wary of relying on *Burlington Northern*, however, given the fact that the Supreme Court in *PRE* specifically disapproved of *Burlington Northern* in fashioning its two-part sham litigation test. *See PRE*, 508 U.S. at 55 n.3. Indeed, post-*PRE* cases with similar facts have recognized that the defendant's standing to bring a lawsuit is not germane in deciding whether the lawsuit itself was objectively meritless. *See, e.g., Liberty Lake*, 12 F.3d at 155. In *Liberty Lake*, a developer named Harry Magnuson solicited and financed straw parties to prosecute an environmental challenge against a competing business. *See Liberty Lake*, 12 F.3d at 158. The *Liberty Lake* court undertook the normal, two part analysis for sham litigation despite the fact that Magnuson was behind the litigation. *See id.* at 157-58. In a case decided before *PRE*, this circuit declined as well to deny *Noerr-Pennington* immunity to non-litigants. *See Hospital Building Co. v. Rex Hospital*, 691 F.2d 678 (4th Cir. 1982) (non-litigants who caused a government entity to file litigation entitled to jury charge of *Noerr-Pennington* immunity).

In this case, we need not decide whether the defendants themselves had independent standing to pursue the zoning litigation in state court because the standing of third parties does not control the sham litigation analysis. Funding of litigation by a non-party can be petitioning to the same extent that filing a lawsuit itself is petitioning. *See Liberty Lake*, 12 F.3d at 157-59; *Opdyke*, 883 F.2d at 1273. Indeed, non-parties often provide aid to litigants, whether through financial backing, legal assistance, amicus briefs, or moral support. The fact that an amicus brief, for example, might be filed by a non-party with some anti-competitive aim does not strip from the amicus its *Noerr-Pennington* right to petition the courts. The realities often are that litigation cannot be entirely financed out of the pocket of the party bringing suit. And the costs of supporting a party's right of access to public bodies need not entail the defense of a collateral antitrust suit. To hold that only parties who have standing in their own right receive the protection of *Noerr-Pennington* immunity is to artificially restrict that

doctrine by penalizing even the lawful support of objectively merito-
rious actions.

Such a limited rule would also severely curtail the rights of all citi-
zens to petition the government and to associate with others who do
so. The First Amendment freedoms of petitioning and of association
protect groups who for whatever reason want to contribute to a law-
suit openly or to stand apart from public view while another party
files a lawsuit, assuming no rule or statute independently requires dis-
closure of the aid. Accordingly, because the litigation was not objec-
tively baseless, and because the source of funding this lawsuit in no
way affected the legitimacy of the claims advanced, the district court
correctly held that the lawsuit was not sham litigation. As that court
noted, Baltimore Scrap has "fail[ed] to show how the legal questions
raised by the citizens groups in the zoning appeal would have lacked
objective merit had the role of the defendants been known." 81 F.
Supp.2d at 615-16.

## IV.

Baltimore Scrap argues in the alternative that even if the lawsuit
was not sham litigation, the defendants' actions do not deserve *Noerr-
Pennington* immunity because of the fraud exception to *Noerr-
Pennington*.

In *PRE*, the Supreme Court specifically left open the question of
whether a fraud exception to *Noerr-Pennington* exists. "We need not
decide here," the Court stated, "whether and, if so, to what extent
*Noerr* permits the imposition of antitrust liability for a litigant's fraud
or other misrepresentations." *PRE*, 508 U.S. at 62 n.6. If a fraud
exception to *Noerr-Pennington* does exist, it extends only to the type
of fraud that deprives litigation of its legitimacy. *See Cheminor Drugs
v. Ethyl Corp.*, 168 F.3d 119, 123-24 (3d Cir. 1999) ("While we do
not condone misrepresentations in a judicial setting, neither will we
deprive litigants of immunity derived from the First Amendment's
right to petition the government if the alleged misrepresentations do
not affect the core" of the litigant's case.); *Liberty Lake*, 12 F.3d at
158-59 (*PRE* "does not obviate application of the Court's two-part
test for determining sham litigation in the absence of proof that a
party's knowing fraud upon, or its intentional misrepresentations to,

the court deprive the litigation of its legitimacy."). Alleged frauds that "do not infect the core" of a case will receive *Noerr Pennington* immunity because regardless of the alleged fraud, the outcome would have been the same. *Cheminor*, 168 F.3d at 123. If a judgment is not procured by fraud or deceit, it cannot fall within any fraud exception to *Noerr-Pennington*. *See PRE*, 508 U.S. at 61-62 n.6; *Liberty Lake*, 12 F.3d at 158-59. Because Baltimore Scrap cannot show that the state court judgment was procured by fraud or deceit, we need not reach the question of whether a fraud exception to *Noerr-Pennington* still exists after *PRE*.

Baltimore Scrap alleges three instances of fraud that deprive the litigation of legitimacy: 1) the defendants' clandestine funding of the citizen groups; 2) the misstatements that Irwin made to Chief Judge Hammerman at the April 23, 1993 hearing about the defendants' role in financing the lawsuits; and 3) the fabricated environmental issues that the citizen groups supposedly raised in their pleadings. Like the district court, we in no way condone the actions of the defendants. Whether to condemn their activities, however, is a different question than whether to abrogate *Noerr-Pennington* immunity for conduct that does not deprive the lawsuit of legitimacy. In achieving an overall public benefit like the right to petition, any immunity will shield individual instances of conduct that might otherwise be actionable. None of the defendants' alleged frauds infected the core of the lawsuit's legitimacy.

Baltimore Scrap first argues that the defendants' failure to inform the citizen groups who was funding the lawsuit deprives the litigation of legitimacy. Specifically, Baltimore Scrap contends that if DJJ or the Shapiro family had revealed its involvement in the litigation, the citizen groups would not have accepted the funding and the lawsuit would have been dropped. Baltimore Scrap specifically points to the testimony of Gloria Sipes, who testified that had she known the defendants were behind the lawsuit, she would not have taken their money. Even if these allegations are true, they do not rise to the level of fraud on the courts. This alleged fraud was solely between the parties. The defendants' failure to tell the citizen groups that they were behind the litigation did not deceive the courts because the courts were not the target of this alleged deception. As the district court noted, Baltimore Scrap's "central problem, which it is unable to over-

come, is that the arguments presented by the citizens groups were legitimate, both objectively and subjectively." 81 F. Supp.2d at 617.

The citizen groups can of course sue the defendants for fraud. Whether such an action by the citizen groups against the defendants for fraud would be successful is another matter. First, and most importantly, the citizen groups were not duped into pursuing a claim they did not want to litigate. In fact, the citizens' objections to Baltimore Scrap's metal shredder existed well before the defendants offered to pay for further litigation. Soon after the citizens learned of the proposed shredder, they voiced their opposition. They attended a meeting with the Maryland Department of Environment on August 12, 1991 to protest the shredder. They wrote a letter to the mayor of Baltimore on August 26 urging him to block its installation. The citizens were extremely worried about the environmental damage that the shredder could cause, especially the increase in air pollution, the release of potentially toxic chemicals, and the potential of higher cancer rates.

Indeed, the citizen groups knew that "local businesses" were paying for the litigation. Despite knowing this fact, they decided to take the money because, as Sipes testified, they "[did] not care" who funded the lawsuit. Moreover, the defendants revealed their involvement to the citizen groups on April 3, 1993. After learning that the defendants were funding the litigation, the citizen groups nevertheless decided to continue their appeal. In sum, the evidence concerning the defendants' secret funding of the lawsuit, construed in the light most favorable to Baltimore Scrap, fails to rise to the level of fraud among the parties. It falls far short of showing the type of fraud upon the court that would deprive the litigation of its legitimacy.

Second, Baltimore Scrap contends that Irwin's alleged misrepresentations to the court about the role of the defendants in the lawsuit constitutes fraud that deprives the litigation of legitimacy. For purposes of summary judgment, we of course assume all facts in the light most favorable to Baltimore Scrap. The problem with Baltimore Scrap's argument remains, however, that Irwin's alleged misstatements were simply not material. Chief Judge Hammerman, before he ruled, stated that he saw the hand of the defendants in the lawsuit. Indeed, he presumed the defendants were involved before he issued

his opinion against the citizen groups and the defendants. The result would have been the same even if Irwin had admitted the defendants' role because no judicial ruling was based on the erroneous assumption that the citizens alone were pursuing the appeal and fully funding the litigation.

If Irwin did indeed misrepresent facts to the court, the proper remedy here is through Maryland law, whether it be through the sanctioning process of the state bar, *see, e.g.,* Md. R. Prof. Conduct 3.3 ("A lawyer shall not knowingly make a false statement of material fact or law to a tribunal."), Md. R. Prof. Conduct 8.4 ("It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit, or misrepresentation [or] engage in conduct that it prejudicial to the administration of justice."), Md. R. 16-812 (adopting the Maryland Rules of Professional Conduct), *Attorney Grievance Comm'n of Maryland v. Middleton*, 756 A.2d 565, 573-74 (Md. App. 2000) (upholding state bar's indefinite suspension of a lawyer because of intentional misrepresentations to a court since "candor and truthfulness are two of the most important moral character traits of a lawyer") (internal quotations omitted); the state Rules of Civil Procedure, *see* Md. R. 1-311 (stating that the effect of a lawyer's signature on the pleadings is to represent "that to the best of the attorney's knowledge, information, and belief there is good ground to support" what was written, and imposing potential disciplinary action for "a wilful violation of this Rule"), Md. R. 1-341 (awarding attorney's fees if "the conduct of any party in maintaining or defending any proceeding was in bad faith . . ."), Md. R. 2-535 (allowing court to revise the judgment "in case of fraud, mistake, or irregularity"), Md. Code Ann. Cts. & Jud. Proc. § 6-408 (1998) (same); or another similar process. The states are perfectly capable of handling malfeasance in their own courts. Federal antitrust law is simply not the proper vehicle to punish an attorney's misconduct in state court.

Baltimore Scrap finally charges that the defendants fabricated environmental issues that caused the litigation to be deprived of legitimacy. Even if true, however, the lawsuit was not decided on environmental grounds. Rather, the lawsuit revolved around the issues of standing and intervention. In no way did the so-called environmental fabrications infect the core of the litigation's legitimacy.

We reiterate that the Supreme Court has not approved a fraud exception to *Noerr-Pennington* immunity at all. *See PRE*, 508 U.S. at 61-62 n.6; *Cheminor*, 168 F.3d at 123-24. Yet the fraud exception as Baltimore Scrap conceives it would have wide ranging implications for our federal system as well as the *Noerr-Pennington* doctrine. A broad fraud exception would allow federal collateral litigation over conduct in state courts that never affected the core of a state judgment. It is simply not the role of federal courts hearing antitrust lawsuits to reconsider the underlying validity of a state zoning contest. We would have to immerse ourselves in the minutiae of state civil proceedings and in effect relitigate the claims that the state courts have already decided. For the federal courts to entertain this type of antitrust action would impermissibly impact the right to petition a coordinate system of justice. Such concerns weigh heavily against creating any broad exception to the immunity created by *Noerr* and its numerous progeny.

## V.

The replay of state law zoning disputes is not normally the proper function of antitrust litigation, especially when the alleged fraud did not deprive the litigation of its underlying legitimacy and when the lawsuit is not objectively meritless. We hold as a matter of law that the defendants' actions do not warrant the dissolution of *Noerr-Pennington* immunity. For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.