EUROTECH, INC., et al., Plaintiffs,

v.

COSMOS EUROPEAN TRAVELS AKTIENGESELLSCHAFT, Defendant.

No. Civ.A.01–1689–A.

United States District Court, E.D. Virginia, Alexandria Division.

March 6, 2002.

Steven B. Ramsdell, Tyler Bartl Burke & Gorman, P.L.C., Alexandria, VA, for plaintiffs.

John Francis Cahill, Carter Ledyard & Milburn, Washington, DC, Rose Auslander, Carter, Ledyard & Milburn, New York City, for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

After losing to a registered trademark owner in a WIPO infringement proceeding, the owner of the allegedly infringing domain name brought this declaratory judgment suit to avoid having to comply with the WIPO order to transfer the domain name. Among the claims asserted in this suit are abuse of process and tortious interference, both of which are based on the trademark owner's filing and maintenance of the WIPO proceeding. Treated here is whether filing and maintaining a WIPO claim can serve as a basis for claims of abuse of process or tortious interference with prospective economic advantage.

### I.

Plaintiff Eurotech, Inc. ("Eurotech"), an Illinois corporation with its principal place of business in Illinois, is a firm that provides consumer and business exchange information and technology services to various businesses. It also has a number of subsidiaries, including co-plaintiff Eurotech Data Systems Hellas, Ltd. ("Hellas"), and owns various domain names, including the domain name here in dispute, "cosmos.com."

Plaintiff, Hellas, a Greek corporation with its principal place of business in Athens, Greece, facilitates global marketing of various products and services for other companies via the Internet. It operates the website located at cosmos.com where it does not directly offer any of the products or services available on its website; it merely permits other companies to use the website to post, manage, and market their own products and services.

Defendant Cosmos European Travels Aktiengesellschaft is a corporation chartered in Liechtenstein that sells and conducts budget vacation packages. Defendant has long made use of the marks "Cosmos" and "Cosmos Tourama" and has registered each in the United States,[1] the United Kingdom, Canada, and Australia for its business of selling and conducting travel tours. Because it has extensively advertised and promoted services relating to its "Cosmos" and "Cosmos Tourama" marks for many years, defendant contends that its marks are famous in the travel industry. Defendant also operates websites located at the domain names "cosmostours.com" and "globusandcosmos.com" for the purpose of promoting its services by providing travel information for travel arrangements of clients and potential clients.

On September 21, 1994, the disputed domain name, cosmos.com, was initially registered with Network Solutions, Inc. (NSI)[2] by Margaret Young, an individual not affiliated with any of the parties in this dispute. In May 1998, Eurotech purchased the domain name from Young.

The cosmos.com website, now operated by Hellas, contains what Hellas terms an "almanac" of information related almost exclusively to travel. The main web page of the almanac opens directly to a page containing the mark "Cosmos.com Cosmotravels" and bearing headings for **Reser-**

---

1. *See* Reg. No. 1,464,902 for "Cosmos" and Reg. No. 1,464,901 for "Cosmos Tourama."

2. NSI has since been acquired by Verisign Global Registry Services. Verisign, located in Herndon, Virginia, continues to operate as one of a number of domain name registrars and the sole registry for all ".com" domain names.

vations, **Destination Guides, Travel Clubs, Airlines, Hotels, Vacations,** and **Cruises.** Participating businesses may contract with Hellas, for the right to use the website to advertise and distribute their products and services. Thus, the cosmos.com website contains information provided to Hellas from companies involved in the travel industry, such as hotels and airline providers, as well as general travel information.

In 2001, Hellas contacted Group Voyagers, Inc. (Voyagers), a subsidiary of defendant, to determine if Voyagers, a company involved in the sale of escorted travel tours to customers in the United States, would be interested in using the cosmos.com website to increase its sales and visibility. Dino Matingas, Hellas's President, engaged in numerous telephone discussions with Steen Born, Voyagers's director of marketing, concerning a possible business relationship between the two companies. The parties also exchanged e-mail messages discussing various business arrangements. Plaintiffs allege that Born suggested that Hellas and Voyagers establish a partnership, utilizing the resources of both companies. It is also alleged that Born suggested a link exchange, whereby Hellas would provide a link to Voyagers's website on the cosmos.com website and Voyagers, in turn, would provide a link to cosmos.com from its website. Hellas declined the offer. Voyagers also offered to purchase the cosmos.com domain name from Hellas, but Hellas also declined this offer.

The discussions between Hellas and Voyagers lasted two months, concluding at the end of May 2001. At the request of Born, they were scheduled to resume in September. Hellas alleges that at no time during any of the discussions did Voyagers manifest disapproval of Hellas's using the term "cosmos.com," either as a domain name or as the business name of Hellas.

On July 20, 2001, defendant, the parent company of Voyagers, filed a complaint with the World Intellectual Property Organization (WIPO) in accordance with the Uniform Domain Name Dispute Resolution Policy (UDRP).[3] In its WIPO complaint, defendant asserted a claim for trademark infringement based on allegations (i) that defendant had consistently used its registered trademarks "Cosmos" and "Cosmos Tourama;" (ii) that the cosmos.com domain name was identical to its "Cosmos" trademark, and confusingly similar to its "Cosmos Tourama" trademark; and (iii) that plaintiffs used the cosmos.com domain name as an integral part of a travel business that competes directly with defendant's business. Defendant further claimed that Hellas had no rights or legitimate interest in the cosmos.com domain name and that the domain name was registered and used in bad faith. For relief, defendant sought an order transferring the registrar certificate for cosmos.com to defendant.

Defendant also asserted that Hellas offered to sell the cosmos.com domain name to defendant, an allegation Hellas disputed. After Hellas filed its response denying that an offer of sale had been made, defendant was allowed to amend its complaint to reflect this fact. Although the WIPO arbitrator[4] allowed defendant

---

**3.** On October 24, 1999, the Internet Corporation for Assigned Names and Numbers (ICANN) adopted the Uniform Domain Name Dispute Resolution Policy, which effectively altered all contracts between domain name registrars and their customers, mandating the use of WIPO arbitration to resolve domain name disputes before resorting to litigation in U.S. courts. Plaintiffs do not dispute this, nor do they dispute that the agreement with Verisign for the cosmos.com domain name now mandates the WIPO proceeding.

**4.** The complaint was assigned to a sole arbitrator, an attorney from the United Kingdom,

to amend the complaint, he declined to give Hellas the opportunity to respond to the amended complaint. On the basis of the arbitration record, the arbitrator ruled that the domain name cosmos.com should be transferred to defendant (i) because the domain name cosmos.com was identical or confusingly similar to defendant's registered trademarks "Cosmos" and "Cosmos Tourama;" (ii) because there was evidence that Hellas was commonly known by the name "Cosmos.com.;" and (iii) because Hellas's use of the cosmos.com domain name was not legitimate or fair. *See* WIPO Case No. D2001–0941.[5] Thus, on October 22, 2001, Hellas was notified by Verisign that unless it commenced a lawsuit by 5 p.m., November 5, 2001, the domain name cosmos.com would be transferred to defendant.

To avoid the transfer, plaintiffs filed this complaint against defendant, asserting the following claims:

(i) declaratory relief with respect to the domain name cosmos.com.;

(ii) unlawful conversion;

(iii) tortious interference with prospective economic advantage; and

(iv) abuse of process.

Defendant responded by seeking threshold dismissal of counts (iii) and (iv) of the complaint and by filing a counterclaim alleging that plaintiffs (1) engaged in trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), (2) engaged in common law unfair competition, and (3) violated the Anticybersquatting Consumer Protection Act (ACPA), 15 U.S.C. § 1125(d). Plaintiffs

then sought to dismiss defendant's counterclaim and to strike the affirmative defenses in defendant's answer.

On February 15, 2002, following oral argument, a bench ruling issued, granting defendant's motion to dismiss counts (iii) and (iv) of the complaint, denying plaintiffs' motion to dismiss defendant's counterclaim, and denying plaintiffs' motion to strike defendant's affirmative defenses. *See Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft,* Civil Action No. 01–1689–A (E.D.Va. Feb. 15, 2002) (order). This memorandum opinion sets forth in greater detail the reasons for dismissal of counts (iii) and (iv) of the complaint.

## II.

Four distinct grounds were advanced in support of the dismissal of the tortious inference with prospective economic advantage and abuse of process claims:

(1) the tortious interference claim fails because plaintiffs cannot plead or prove the requisite intent of defendant to injure plaintiffs' business and cannot plead or prove any interference with a specific business relationship;

(2) the abuse of process claim fails because plaintiffs cannot plead or prove that defendant brought the WIPO claim for an ulterior purpose;

(3) both claims fail because the *Noerr–Pennington* doctrine immunizes defendant from tort claims based on defendant's initiating and maintaining the WIPO proceeding;

the location of defendant's principal place of business.

**5.** Worth noting here is that the result reached in the WIPO proceeding is neither admissible, nor entitled to any deference, with respect to the merits issues presented in this suit. Review here must be *de novo* and independent of

any WIPO panel conclusion. *See International Bancorp v. Societe Des Baines De Mer Et Du Cercle Des Etrangers A Monaco,* —— F.Supp.3d ——, ——, 2002 WL 334745, *17 n. 14 (E.D.Va.2002) (citing *Parisi v. Netlearning, Inc.,* 139 F.Supp.2d 745, 752 (E.D.Va. 2001)).

(4) both claims fail because plaintiffs, by purchasing the cosmos.com domain name, agreed to submit to a WIPO proceeding in the event of a domain name dispute.

Each is treated separately.

### A. *Absence of necessary elements of tortious interference*

■ In Virginia,[6] maintenance of a tortious interference with prospective economic advantage claim requires, *inter alia*, alleging and proving two elements. First, a plaintiff must allege and show that defendant's actions were aimed at injuring the plaintiff's business.[7] This, the instant plaintiffs cannot do. Here, defendant's goal in instituting the WIPO proceeding was not to injure plaintiffs' business, but rather defendant's manifestly legitimate aim of protecting against unauthorized use of its registered "Cosmos" and "Cosmos Tourama" trademarks. To be sure, the WIPO proceeding could have an incidental adverse effect on plaintiffs' business were defendant to prevail in the proceeding. But, in no sense can this incidental effect be said to be the essential aim or purpose of defendant in pursuing the WIPO remedy.

Second, plaintiffs must plead and prove that defendant's intentional conduct interfered with a business relationship or expectancy, resulting in damage.[8] In this respect, plaintiffs assert only generally that defendant's WIPO claim prevented plaintiffs from establishing business relationships with third parties regarding the cosmos.com website. This is inadequate.[9] Nor is it likely that plaintiffs will be able to remedy this deficiency as they do not suggest the existence of any actual business relationships with which defendant may have tortiously interfered. *See Edwards v. City of Goldsboro*, 178 F.3d 231,

---

**6.** Virginia choice of law rules apply here because a district court entertaining pendent state claims should follow the choice of law rules of the forum state. *ITCO Corp. v. Michelin Tire Corp., Commercial Div.*, 722 F.2d 42, 49 n. 11 (4th Cir.1983); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (holding that in diversity cases, federal courts apply the choice of law rules of the forum state). In tort cases, Virginia applies the rule of *lex loci delicti;* the place of the injury supplies the governing law in tort actions. *See Jones v. R.S. Jones and Assoc., Inc.*, 246 Va. 3, 431 S.E.2d 33, 34 (1993); *see also Diaz Vicente v. Obenauer*, 736 F.Supp. 679, 690 (E.D.Va.1990).

Here, the parties assumed without analysis that Virginia substantive law applied. While it is undisputed that the domain name was registered with NSI/Verisign in Herndon, Virginia and that the registrar certificate has been deposited with the Clerk of this Court, neither party addressed the location of the place of injury, *i.e.*, where the injury occurred. For example, the record does not disclose the location of the server containing the content of the cosmos.com website. Given the absence of evidence of the place of the injury and the absence of any dispute between the parties on governing law, the analysis here proceeds on the premise that Virginia substantive law governs the tortious interference and abuse of process claims. In any event, to the extent that this choice of law analysis is problematical, it does not alter the result reached here because there are additional, independent reasons for dismissal of the claims.

**7.** *See Jordan v. Hudson*, 690 F.Supp. 502, 507 (E.D.Va.1988), *aff'd*, 879 F.2d 98 (4th Cir. 1989); *Commercial Energies, Inc. v. United Airlines, Inc.*, 1994 WL 251849, *4 (4th Cir. 1994) (unpublished disposition).

**8.** *See Commerce Funding Corp. v. Worldwide Sec. Services Corp.*, 249 F.3d 204, 213 (4th Cir.2001); *Commercial Business Sys., Inc. v. Halifax Corp.*, 253 Va. 292, 484 S.E.2d 892 (1997).

**9.** *See Commerce Funding Corp.*, 249 F.3d at 213 (holding that a plaintiff must plead and prove that defendant's intentional conduct interfered with a business relationship or expectancy, resulting in damage).

242 (4th Cir.1999) (holding that leave to amend a complaint should be denied when such an amendment would be futile). Because plaintiffs do not identify the specific business relationships with which defendant has interfered, plaintiffs' tortious interference claim fails.[10]

### B. Absence of necessary elements of abuse of process

■ To prevail on an abuse of process claim, plaintiffs must plead and prove, *inter alia*, that defendant possessed an ulterior purpose when bringing the WIPO complaint.[11] Again, plaintiffs can do neither; nor is this a mere pleading deficiency; the manifestly legitimate purpose of the WIPO claim was to assert trademark rights. Although plaintiffs also argue that defendant's initial WIPO complaint was untruthful because it alleged that Hellas had offered to sell the cosmos.com domain name, this fact, even if true, does not save the claim, for this allegation, assuming its inaccuracy, was made not for some ulterior purpose, but rather to protect trademark rights.

Plaintiffs also assert that the WIPO arbitrator's allowing defendant to amend its complaint without letting plaintiff respond constituted abuse of process. Even assuming, *arguendo*, the WIPO arbitrator erred, this would not support plaintiffs' abuse of process claim against defendant because the appropriateness of the arbitrator's decision has nothing to do with defendant's purpose in initiating and pursuing the WIPO claim.

It must also be said that an inaccurate factual allegation that is subsequently corrected is hardly the occasion for an abuse

of process claim. It is not uncommon in litigation for parties to amend pleadings to correct an inaccurate allegation. Such a circumstance is too thin a need to support an abuse of process claim.

### C. The Noerr–Pennington doctrine

■ Counts (iii) and (iv) of the complaint also fail because the *Noerr–Pennington* doctrine confers immunity to those seeking WIPO redress to protect their trademarks.

The *Noerr–Pennington* doctrine was judicially created in antitrust law for the purpose of guaranteeing "citizens their First Amendment right to petition the government for redress without fear of antitrust liability." *Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 398 (4th Cir.2001) (citing *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136–39, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 669, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965)). The doctrine was created in 1961, when the Supreme Court held in *Noerr* that "the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint [of trade] or a monopoly." *Noerr*, 365 U.S. at 136, 81 S.Ct. 523. Thus, this principle served to immunize the concerted publicity and lobbying efforts of twenty-four railroads, an association of their presidents, and a public relations firm to obtain legislation to restrict competition from the trucking industry. *See id.* at 136–39, 81 S.Ct. 523. Four

---

**10.** While this deficiency might conceivably be remedied by amendment, this appears unlikely. In any event, the claim of tortious interference fails for alternate reasons. *See* parts II.A, II.C, II.D.

**11.** *See Donohoe Constr. Co. v. Mount Vernon Assocs.*, 235 Va. 531, 369 S.E.2d 857, 862 (1988) (holding that having an ulterior motive is an element of an abuse of process claim); *Mullins v. Sanders*, 189 Va. 624, 54 S.E.2d 116, 121 (1949) (same).

years later, in 1965, the Supreme Court extended *Noerr–Pennington* immunity, as it came to be known, from the legislative and executive arenas to the administrative arena when it held that the collaborative efforts of large coal mine operators and the United Mine Workers Union to persuade the Secretary of Labor to establish higher minimum wages for workers supplying coal to the Tennessee Valley Authority was immune from antitrust attack. *See Pennington,* 381 U.S. at 669–70, 85 S.Ct. 1585. Significantly, the Supreme Court also held that immunity existed even if the intent of collaborators was to restrict competition. *See id.* at 670, 85 S.Ct. 1585.[12]

Since its formulation, courts have extended this judicial doctrine well beyond its original boundaries. No longer is it limited to conferring antitrust immunity for concerted efforts to influence legislators and administrators. It is now clear that the doctrine has been extended to confer immunity from a variety of tort claims, including claims of tortious interference and abuse of process.[13] And, it is equally clear that concerted activity aimed

at seeking redress from courts is immunized for the same reasons that support immunity for such activity when aimed at legislative and administrative bodies.[14]

Thus, the only questions remaining regarding the *Noerr–Pennington* doctrine's applicability here are (i) whether WIPO arbitration proceedings are protected by the *Noerr–Pennington* doctrine, and, if so, (ii) whether the sham litigation or fraudulent litigation exceptions to the *Noerr–Pennington* doctrine apply here. *See Baltimore Scrap,* 237 F.3d at 399.

Plaintiffs assert that because WIPO is a private entity, arbitration under WIPO auspices is a wholly private matter undeserving of *Noerr–Pennington* immunity. This argument is unpersuasive because WIPO is not simply and solely a private body; rather, it is a quasi-public organization that is an integral part of the United Nations system of organizations, with a mandate to administer intellectual property matters. With its headquarters in Geneva, Switzerland, WIPO administers 23 treaties and has 178 member states, including the United States. In this regard, it is important to note that the United

---

**12.** It is clear that *Noerr–Pennington* immunity protects not only collaborators, but also individuals acting alone. *See Ottensmeyer v. Chesapeake & Potomac Telephone Co.,* 756 F.2d 986, 993–94 (4th Cir.1985) (citing with approval *Forro Precision, Inc. v. International Business Machines Corp.,* 673 F.2d 1045, 1059–60 (9th Cir.1982)).

**13.** *See Virtual Works, Inc. v. Network Solutions, Inc.,* 1999 WL 1074122 (E.D.Va.1999) (applying the *Noerr–Pennington* doctrine to tortious interference claims arising in the context of a trademark infringement matter); *see also Brownsville Golden Age Nursing Home, Inc. v. Wells,* 839 F.2d 155, 159–60 (3d Cir.1988) (recognizing applicability of the doctrine to conspiracy, abuse of process, and other claims); *Havoco of Am., Ltd. v. Hollobow,* 702 F.2d 643, 649 (7th Cir.1983) (applying *Noerr–Pennington* protection to claims of tortious interference with business relation-

ships); *Baltimore Scrap Corp. v. David J. Joseph Co.,* 81 F.Supp.2d 602, 620 (D.Md.2000), *aff'd,* 237 F.3d 394 (4th Cir.2001) (holding that *Noerr–Pennington* immunity applies to common law claims); *Thermos Co. v. Igloo Products Corp.,* 1995 WL 745832, *6 (N.D.Ill. 1995) (holding that "attempts to protect a valid and incontestable trademark" are privileged under the *Noerr–Pennington* doctrine).

**14.** *See Baltimore Scrap,* 237 F.3d at 399 (holding that *Noerr–Pennington* immunity extends to the adjudicatory process because "the rights of petition and association trump any anticompetitive effects that might occur from asking the government for redress ... and that [a]ny other rule would allow the specter of satellite litigation to restrict the primary right of citizens to seek justice from the judicial system") (citing *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510–11, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972)).

States Department of Commerce participated in establishing WIPO's UDRP procedures to provide "a streamlined, inexpensive administrative dispute-resolution procedure" for Internet domain names. *See Parisi v. Netlearning, Inc.,* 139 F.Supp.2d 745, 746–47 nn. 4–5 (E.D.Va. 2001). It is also clear that WIPO proceedings, a form of arbitration, are part of the adjudicatory process and thus warrant *Noerr–Pennington* immunity.[15] Thus, given WIPO's quasi–public nature, it is reasonable and appropriate that the *Noerr–Pennington* doctrine, already applicable to cover resort to the judicial process, should also apply to the initiation and maintenance of WIPO arbitration proceedings.[16]

■ Although it is well-established that *Noerr–Pennington* immunity applies to adjudicatory proceedings, the doctrine does not protect sham litigation.[17] Sham litigation must be objectively frivolous or meritless and must originate from a litigant's subjective motivation to interfere directly with business relationships of a competitor through the litigation. *See Professional Real Estate Investors v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 61, 113

S.Ct. 1920, 123 L.Ed.2d 611 (1993) (*PRE*). In no way can it be said that defendant's WIPO claim constitutes sham litigation; far from being frivolous or objectively meritless, the claim was based on registered trademarks, one of which is identical to the disputed domain name and the second is similar to it.

■ Plaintiffs also contend that because the *Noerr–Pennington* doctrine does not immunize "fraudulent litigation," defendant's inaccurate allegation in its WIPO complaint that Hellas offered to sell the cosmos.com. domain name to Voyagers does not warrant *Noerr–Pennington* immunity. This argument is unpersuasive. As the Fourth Circuit has recognized, the Supreme Court has left open the question whether a fraudulent litigation exception to the *Noerr–Pennington* doctrine exists at all. *See Baltimore Scrap,* 237 F.3d at 401 (citing *PRE,* 508 U.S. at 61 n. 6, 113 S.Ct. 1920 (1993)). And, the Fourth Circuit noted that "[i]f a fraud exception to *Noerr–Pennington* does exist, it extends only to the type of fraud that deprives litigation of its legitimacy." *Baltimore Scrap,* 237 F.3d at 401–02.[18] Moreover,

---

**15.** In *Hightower v. GMRI, Inc.,* 272 F.3d 239, 241 (4th Cir.2001), the Fourth Circuit noted that the Federal Arbitration Act, 9 U.S.C. § 1–16 embraced "arbitration as a less formal and more efficient means of resolving disputes than litigation" and thus was an important, indeed favored, component of the adjudicatory process.

**16.** Also worth noting at this point is that plaintiffs' position with respect to the abuse of process claim and the *Noerr–Pennington* doctrine is contradictory. On the one hand, plaintiffs assert that defendant's maintenance of the WIPO proceeding constitutes abuse of process, yet, to counter defendant's *Noerr–Pennington* argument, plaintiffs argue that the doctrine does not apply because WIPO is a private body and its procedures do not constitute "process." Plaintiffs cannot have it both ways: either a WIPO proceeding is "process," as held here, in which event *Noerr–*

*Pennington* applies to bar plaintiff's tort claims based on defendant's maintenance of the WIPO claim, or the WIPO proceeding is not "process," as plaintiffs claim to avoid *Noerr–Pennington,* in which event there can be no abuse of process claim.

**17.** *See Baltimore Scrap,* 237 F.3d at 399.

**18.** *See also Cheminor Drugs v. Ethyl Corp.,* 168 F.3d 119, 123–24 (3d Cir.1999) ("While we do not condone misrepresentations in a judicial setting, neither will we deprive litigants of immunity derived from the First Amendment's right to petition the government if the alleged misrepresentations do not affect the core" of the litigant's case.); *Liberty Lake Investments, Inc. v. Magnuson,* 12 F.3d 155, 158–59 (9th Cir.1993) (*PRE* "does not obviate application of the Court's two-part test for determining sham litigation in the absence of proof that a party's knowing fraud upon, or

"[a]lleged frauds that 'do not infect the core' of a case will receive *Noerr–Pennington* immunity because regardless of the alleged fraud, the outcome would have been the same." *Baltimore Scrap,* 237 F.3d at 402 (quoting *Cheminor Drugs v. Ethyl Corp.,* 168 F.3d 119, 123 (3d Cir. 1999)). Here, it is clear that the alleged "fraud" did not "infect the core" of this case because defendant amended its WIPO complaint, thus removing the incorrect allegation. Moreover, it is clear that the WIPO arbitrator, who allowed defendant to amend its complaint, did not base his decision on inaccurate information, but on defendant's amended WIPO complaint. Thus, even assuming the existence of a fraudulent litigation exception to the *Noerr–Pennington* doctrine, such an exception would not apply here.

### D. Agreement to submit to WIPO arbitration

■ The final, fatal obstacle to plaintiffs' abuse of process and tortious interference claims based on the WIPO proceeding is that plaintiffs agreed to such a proceeding as a condition of registering the disputed domain name.[19] From the fact of this agreement, it follows that plaintiffs cannot complain that the institution of the WIPO proceeding is a basis for any tort claim. An agreement to participate in a proceeding cannot render initiation of that proceeding a tort claim

Yet, plaintiffs also claim that even if defendant's initiating the WIPO proceeding itself does not constitute abuse of process or tortious interference, the inaccuracies in defendant's initial WIPO complaint constitute abuse of process and tortious interference. But, as noted, misstating facts in a complaint cannot state a proper cause of action for tortious interference or abuse of process because tortious interference requires pleading and proof of a purpose to harm prospective economic opportunities and abuse of process requires pleading and proof of an ulterior motive, neither of which are present here.[20] And, the arbitrator's permitting defendant to amend its complaint while not allowing Hellas to reply to the amended complaint likewise cannot support a claim of abuse of process or tortious interference.

Thus, for the reasons stated above, counts (iii) and (iv) of the complaint were appropriately dismissed.

its intentional misrepresentations to, the court deprive the litigation of its legitimacy.'").

19. Consistent with ICANN policy, all domain name contracts with Verisign require the use of WIPO proceedings to resolve domain name disputes. Because this requirement is part of the domain name registration contract between Verisign and Eurotech, it is proper to

evaluate the meaning of such contracts referenced in the pleadings at this threshold dismissal stage. *See, e.g., Eastern Shore Markets, Inc. v. J.D. Associates Ltd. Partnership,* 213 F.3d 175, 179–81 (4th Cir.2000) (noting that it is proper to construe the meaning of contracts at the threshold dismissal stage).

20. *See supra* parts II.A, II.B.